## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JULIE ANN ROEHM,

        Plaintiff,

   v.                              CASE NO. 2:07-cv-10168

WAL-MART STORES, INC.,

        Defendant.                Judge Lawrence P. Zatkoff
                                   Mag. Judge R. Steven Whalen

## COUNTERCLAIM

COMES NOW Defendant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") and brings this Counterclaim against Plaintiff Julie Ann Roehm ("Roehm") for breach of fiduciary duty. Wal-Mart expressly preserves all defenses and, by bringing this Counterclaim, denies all of Roehm's claims and contentions, except as expressly admitted in Wal-Mart's answer.

For its Counterclaim against Roehm, Wal-Mart states as follows:

### I.      INTRODUCTION

1.    Corporate executives are held to an especially high standard compared to other employees – and for good reason. They hold sway over corporate assets and finances. They make business decisions that affect the lives and well-being of employees and shareholders. Their actions shape the future of the company, its image, and its dealings with the public, customers, and contractors. Because they hold such positions of trust and responsibility, executives also have heightened duties of loyalty and care to the company and its employees and shareholders. When they take actions that are wasteful and harmful to the company and its

Dockets.Justia.com

employees in order to gain personal advantage for themselves, they breach their fiduciary responsibilities. That has been the story of Julie A. Roehm.

2.      During much of 2006, until their involuntary separation on December 4, 2006, Roehm and her deputy, Sean L. Womack ("Womack"), served as officers of Wal-Mart Stores, Inc. – Roehm as Wal-Mart's Senior Vice President for Marketing Communications, and Womack as Wal-Mart's Vice President of Communications Architecture. In those roles, Roehm and Womack had important responsibilities for managing Wal-Mart's relationships with outside advertising agencies, including the selection and supervision of outside advertising firms in one of the most high-profile advertising bidding opportunities in the nation in 2006 – a review process to select advertising agencies for Wal-Mart's $580 million annual advertising budget. In exchange for discharging her important responsibilities, Roehm was well compensated.

3.      Rather than exercise her duties with care and loyalty, Roehm repeatedly furthered her own personal interests to the detriment of the Company and its Associates, in breach of her fiduciary duties of care and loyalty as a Wal-Mart officer. Instead of working solely in Wal-Mart's interests, she frequently put her own interests first. She did not merely fail to avoid conflicts of interest; she invited them. Rather than serve as a model for company employees, she flouted express Wal-Mart policies, not to mention basic principles of corporate ethics. And although Roehm has attempted to spin a public tale since her departure that she was discharged for being a "change agent" and an "envelope pusher," in reality she and Womack were terminated for violating their fiduciary duties as Wal-Mart officers and clearly established corporate standards of conduct.

4.      Specifically, Roehm (1) engaged in inappropriate dealings and relationships with an advertising agency seeking to do business with Wal-Mart, (2) used her position and authority

2

to secure personal benefits from potential suppliers, including accepting and retaining gifts and gratuities and soliciting employment opportunities from a supplier, (3) expended Wal-Mart time and resources in the course of an inappropriate romantic relationship, and (4) lied about these activities when questioned by Wal-Mart officials.

## II.    PARTIES

5.      Wal-Mart is a Delaware corporation with its headquarters and principal place of business in Bentonville, Benton County, Arkansas.  Wal-Mart is an international retailer which operates, among other things, Discount Stores, Supercenters, SAM'S CLUBS, Neighborhood Markets and other retail store formats throughout the world.  Wal-Mart conducts regular and ongoing business in the Eastern District of Michigan, including the County of Oakland.

6.      As alleged in her Complaint, Roehm resides in the City of Rochester Hills, County of Oakland, State of Michigan.  From February 6, 2006 until December 4, 2006, Roehm was employed as an officer of Wal-Mart.

## III.    JURISDICTION AND VENUE

7.      Roehm initially filed this action in the Circuit Court for the County of Oakland. On January 10, 2007, Wal-Mart removed the action to this Court, which has jurisdiction over the matter pursuant to 28 U.S.C. § 1332.  Accordingly, this Court has jurisdiction over this Counterclaim, and venue is proper in the Eastern District of Michigan.

## IV.     WAL-MART'S STATEMENT OF ETHICS AND CORPORATE POLICIES

8.     Wal-Mart's commitment to keeping its business operation costs low is reflected throughout its corporate policies.  A principal purpose of these policies is to assure that Wal-Mart Associates, including its officers, base their decisions on the merits and the Company's best interests, and that they are not swayed by personal gratuities and considerations.  The policies are also intended to avoid even the appearance of improper influence upon the Company's decisionmaking in the selection and supervision of vendors.

9.     Accordingly, Wal-Mart's Statement of Ethics ("Statement") contains a firm policy forbidding conflicts of interest.  The Statement clearly provides that all Wal-Mart Associates owe certain responsibilities to Wal-Mart, including the affirmative "responsibility to avoid situations and relationships that involve actual or possible conflicts of interest."  The Statement also specifically cautions that "[t]he appearance of a conflict may be just as damaging to Wal-Mart's reputation as an actual conflict."

10.     The Statement explains that "[a] conflict situation can arise if you take actions or have interests that are inconsistent with the interests of Wal-Mart or that may interfere with your ability to perform your job effectively on behalf of the Company. . . . You are responsible for advancing Wal-Mart's business interests when the opportunity to do so arises.  You may not take any opportunities or use any confidential information for your benefit . . . that you discover or obtain through your employment with Wal-Mart."

11.     Wal-Mart's prohibition on conflicts of interest and on the misuse of Wal-Mart assets and opportunities is further manifested in a number of specific policies and prohibitions.

12.     First, the Statement makes clear that "Wal-Mart bases its relationships with suppliers on lawful, efficient and fair business practices."  Accordingly, Wal-Mart officials must

"[a]void conflicts of interest in supplier selection, such as directing business to a supplier owned or managed by a relative or a friend." In order to avoid creating such situations, the Statement specifically warns Wal-Mart officials: "Do not have social or other relationships with suppliers, if such relationship would create the appearance of impropriety or give the perception that business influence is being exerted. If you believe that you may be perceived to have an inappropriately close relationship with a supplier or appear to be exerting business influence, you should inform your supervisor."

13. Second, and relatedly, Wal-Mart has a well-known policy strictly prohibiting company officers and other Associates from accepting gifts or gratuities from vendors who do, or seek to do, business with the Company. The Statement is unambiguous: "You may not request, encourage or accept a gift or gratuity from a supplier, potential supplier or any person who you believe may seek to influence any business decision or transaction involving Wal-Mart." The Statement specifically mentions as "[e]xamples of gifts or gratuities": "tickets to . . . entertainment events" and "liquor or meals." The Statement further directs that "[a]ny gift or gratuity received from a supplier must be returned with an explanation of this policy. . . . Any offer of a gift or gratuity must be reported to your supervisor."

14. Third, the Statement warns that "Wal-Mart property should be used only for Wal-Mart business and should not be used for any type of personal gain." Furthermore, according to Wal-Mart Corporate Policy governing travel expenses, only "reasonable and necessary expenses, which relate to business activity and are properly supported by receipts, will be reimbursed."

15. Fourth, Wal-Mart Corporate Policy states that "[i]t is against Company policy for a Supervisor to become romantically involved with an Associate he or she supervises or with an

Associate whose terms and conditions of employment he or she may have the ability to influence. . . . Associates who violate this policy will be subject to immediate termination."

16.     These policies apply to all Wal-Mart Associates, and they applied to Roehm and Womack throughout their employment with the Company.

## V.     ROEHM'S CONDUCT DURING HER EMPLOYMENT WITH WAL-MART

### A.     Roehm and Womack commence employment with Wal-Mart

17.     On January 13, 2006, Roehm entered into an at-will employment arrangement with Wal-Mart to serve as Senior Vice President, Marketing Communications.  In that position, Roehm was to have significant responsibility for Wal-Mart's relationships with outside advertising agencies, including the selection and supervision of outside advertising firms and the development, in conjunction with those firms and other Wal-Mart personnel, of advertising campaigns suitable for Wal-Mart and its customers and prospective customers.

18.     Womack first began working with Wal-Mart on a contract basis while employed by the advertising agency Saatchi X.  While employed by Saatchi X, Womack was assigned on a temporary basis to fill in for a Wal-Mart creative design director who was on maternity leave. Roehm arrived in Bentonville shortly after Womack began his temporary assignment, and the two quickly became close.  By February 22, 2006, Roehm was e-mailing Womack that she was "smiling because I am so happy you are here with me :)))."  In another e-mail exchange in early March, after Roehm left on a business trip to San Francisco, Womack wrote: "You left without saying goodbye.  Maybe I'll call…"  Roehm responded: "I will miss you… Goodbye."  A few days later Womack e-mailed Roehm:  "Thanks for taking care of me."  Roehm replied: "We take care of each other…its the only way through this."

19.    As Womack began to work closely with Roehm, their personal relationship deepened.  He expressed an interest in securing full-time employment with Wal-Mart and reporting directly to Roehm.  On April 19, 2006, Womack e-mailed Roehm, relaying some concerns about that potential employment and telling Roehm that he was "waiting on an offer from you."  In this e-mail, Womack wrote that "[t]here are two reasons I want to come here, and you are at the top of the list…  I've told you, it is really hard for me to say no to you."  Later that same month, Roehm e-mailed Womack, stating: "I don't need you to treat me like a boss – you are my equal and friend and I wouldn't have it any other way."  Eager to have her new "friend" working under her on a daily basis, Roehm took steps to secure employment for Womack with Wal-Mart.

20.    On June 1, 2006, Womack entered into an at-will employment arrangement with Wal-Mart to serve as Vice President of Communications Architecture, reporting directly to Roehm.

21.    As officers and agents of Wal-Mart, Roehm and Womack were fiduciaries of the Company.  As fiduciaries, Roehm and Womack owed the Company a number of duties under the law, including the duties of loyalty and care.

**B.    Roehm assumes responsibility for Wal-Mart's advertising agency review process**

22.    Shortly after Roehm's arrival, Wal-Mart initiated a process to identify, select, and retain multiple advertising agencies to handle its advertising accounts.  The budget for the accounts was approximately $580 million, making the Company's decision one of the most anticipated events in the advertising industry that year.  In order to identify and consider a range of qualified candidates for its multi-million dollar advertising accounts, Wal-Mart issued

"Requests for Proposal," or "RFPs," inviting numerous leading advertising firms to bid for the accounts.

23.     The agency review process was an expensive undertaking for Wal-Mart, requiring the time and attention of numerous Wal-Mart personnel, the retention of an outside firm to assist in the process, and multiple stages transpiring over a period of months as the Company moved toward its final selections.  Because of the size of the advertising accounts and the importance to Wal-Mart of successful marketing strategies and campaigns, effective supervision of the selection process was essential.

24.     Roehm assumed lead responsibility for the RFP process and subsequent agency reviews, the most important matter under her supervision for the Company.   At Roehm's suggestion, Womack was added to the team responsible for the advertising agency reviews.

**C.     Roehm pursues her inappropriate relationship at Wal-Mart's expense**

25.     Roehm was Womack's direct supervisor during the entire time Womack was employed at Wal-Mart.  But despite this employment relationship and the restrictions imposed by Wal-Mart's non-fraternization policy, Roehm and Womack developed a relationship that went far beyond that of supervisor and subordinate.  Womack frequently referred, and continues to refer, to Roehm as the "big sister [he] never had."  In fact, however, the relationship between Roehm and Womack was far more intimate and unquestionably inappropriate.

26.     The two spent extensive time together as part of the RFP process, frequently traveling on the same itineraries to visit various agencies.  They recognized that the amount of time they spent together was causing concerns – in a May 31, 2006 email to Womack, Roehm stated "Screw everyone who thinks we spend too much time together."  Yet, they privately lamented that even this amount of time was not enough.  In a July 2006 email exchange that

began with a message from Roehm to Womack "You want to talk?  Call my cell . . .", Roehm and Womack discussed their desire to spend even more time together.  The email exchange included the following:

Roehm:  "I will give you whatever time you need :)"

Womack:  "You don't have that much time . . ."

Roehm:  "I might . . i think its you who doesnt . . ."

Womack:  "I'd like 24-7-365 if that is do-able . . ."

Roehm:  "You know I would . ."

27.    As early as June 2006, it appears that Roehm and Womack had begun to alter their schedules to increase the time spent together.  In one June email exchange, Roehm lamented "Sad that I can't have drinks with you Monday night . . ."  In response, Womack typed "I'll try to come home early on the QT . . ." to which Roehm replied ":)))))"

28.    By August 2006, the relationship had become romantic.  On Saturday, August 5, Womack and Roehm spent the evening with colleagues and relatives at a bar in Fayetteville, Arkansas.  By the end of the evening, everyone had left except Roehm, Womack and two of their Wal-Mart colleagues – a close friend of Womack and a close friend of Roehm.  At one point, Womack and Roehm left the table together to go to another part of the bar.  Later, when Womack's friend was on his way to the restroom he spotted Womack and Roehm in a corridor. Womack had Roehm "pinned" against the wall in an intimate pose.  Womack's friend paused awkwardly for several seconds, then announced his presence and walked past the two of them. When the friend came back, Womack and Roehm were no longer in the corridor.  Womack later denied to his friend that anything inappropriate was going on.

29.     On September 7, 2006, Womack's wife, Shelley, learned that Womack had set up a secret, personal email account that he used to communicate with Roehm. Upon reviewing the contents of the email account, Shelley discovered romantic email messages between Roehm and her husband on the Womack's home computer. She called her husband and demanded he come home immediately. When he arrived, she told him she had found emails between him and Roehm on the computer and that she had printed out, among other things, a recent email exchange between Roehm and him that proved the existence of their affair. Womack tried to grab the document from Shelley, and when Shelley went to another part of the house to hide the printed material, he went to the computer and attempted to delete all the email messages from his account.

30.     One series of messages preserved by Shelley began just days before her discovery. In the first message, Womack wrote to Roehm: "my gmail is secure…write to me. tell me something. anything…I feel the need to be inside of your head if I cannot be near you." Roehm responded: "I miss you ridiculously…how about that…I hate not being able to call you or write you. I think about us together all of the time. Little moments like watching your face when you kiss me. I loved your voicemail last night and love the idea of memory and kept thinking/wishing that it would have been you and I there last night. So, there's a little head action for you. I'm getting ready to take the kids to the park and I know you will be getting ready for the wedding soon. Its pointless to say 'have a good time' because I know you won't anymore than I will. I just try to find ways to pre-occupy my mind." Womack replied: "that was some good head action for me. yes. you can call & you can write me here."

31.     Upon being confronted with the emails by his wife, Womack admitted to a sexual relationship with Roehm. He shared with her several details, including when the affair began

and the number of times they had engaged in sexual intercourse while traveling on Wal-Mart business. Womack also told his wife that he would end the affair. Later, however, he attempted to recant his story and tell Shelley that there had been no affair. Nevertheless, the Womacks soon separated.

32.     Womack's co-worker friend also confronted him about his relationship with Roehm. The friend knew that Womack had admitted to Shelley that he had been in the midst of a physical and emotional affair with Roehm. Womack acknowledged the affair to his friend, but then at other times offered implausible explanations for the evidence of its existence, including excuses for why he had admitted the affair to his wife.

33.     Womack's friend also spoke with Roehm about the relationship. A few days after the incident at the Womack house where Womack tried to destroy evidence of the affair, Roehm invited Womack's friend (who indirectly reported to Roehm) to lunch. Roehm admitted to an "emotional affair" with Womack but insisted they never had sex. When pressed about physical contact between the two, she acknowledged they had "fooled around" a "couple of times." Roehm professed to feeling horrible about breaking up Womack's family, adding that she and her husband were going to work things out. She said she knew she would be fired if the Company were aware of her actions with Womack.

34.     In order to facilitate their inappropriate and secret romantic relationship, and to do so at Wal-Mart expense, Roehm – both before and after Womack's wife discovered the romantic emails – misused the agency review process and engaged in travel paid for by Wal-Mart and for the ostensible purpose of furthering Wal-Mart's business interests, but for the actual purpose of spending personal time with Womack. Roehm and Womack also inappropriately extended business travel in order to spend additional personal time with one another at Wal-Mart expense

and to further their own self interests.  Such extensive and unnecessary travel not only misused Wal-Mart resources, but caused Roehm and Womack to give inadequate attention to their assigned responsibilities.

35.     For example, Roehm and Womack extended a trip to Chicago to engage in conduct and discussions described in more detail below that were decidedly contrary to Wal-Mart's interests.

**D.     Roehm engages in favoritism and personal dealing with DraftFCB in a manner that violates Wal-Mart policies**

36.     Due to the size of the $580 million advertising budget under consideration and the significant public attention given to Wal-Mart generally, Roehm's prominent role in the agency review process made it particularly important that she abide by the Company's conflict of interest and gift and gratuities policy throughout the review process and that she avoid even the appearance that the review was biased or tainted in any way.

37.     Despite this, as the agency review process unfolded, Roehm displayed increasing and inappropriate favoritism toward one particular participant in the process, DraftFCB, and its officers and agents, in particular Tony Weisman ("Weisman"), who at the time was employed by DraftFCB.

38.     During the time that DraftFCB was actively pursuing Wal-Mart's general market advertising account, the largest portion of the advertising budget under review, Roehm and Womack maintained nearly daily, direct contact with Weisman – well exceeding normal customary contact with prospective suppliers.  They met him for dinner and drinks on many occasions outside the formal review process and provided insights and advice to DraftFCB that were not provided equally to the other agencies being considered in the review.

39.     An August 19, 2006 meeting is illustrative.  On August 10, Roehm and Womack had scheduled identical flights for a few days later.  As part of the itinerary, they were scheduled to fly from Miami to Chicago on Friday, August 18, returning to Bentonville on Saturday, August 19.  The purpose of the Chicago leg of the trip was to meet with another of the participants in the RFP process.  In an email to Roehm on August 11 – the day after the flights had been scheduled – Weisman wrote that he heard Roehm would be in Chicago and asked whether she would "have time for a quick hello while here?  Even Irish Coffee on Saturday morning?"  Roehm replied that she would ask her assistant to let Weisman know her schedule but was "not sure it will work this time."

40.     Later the same day, however, Roehm had a change of heart.  Weisman sent another email telling Roehm that the Blue Angels would be performing as part of an air and water show on Lake Michigan the weekend of the 19th and offered to take Roehm and Womack "out on the lake to see the rehearsal" on Friday, August 18.  Roehm responded "that is awesome" and that she and Womack would "have to wrap the meeting quick and maybe I will plan to stay Sat for the show!"  Although her itinerary had already been set, she asked her assistant to "look at flts before we book."

41.     Later that day, Weisman supplied Roehm further details about the air and water show, adding a special personal invitation.  "I'll be on our sailboat during the show, best seat in the house.  Of course if you do stay overnight we could take you out to see the show on Sunday on the boat which is a lot of fun.  Let me know."  Rather than decline the invitation as an improper gift, Roehm replied "Will do."

42.     Four days later, on August 15, Weisman sent Roehm an email asking "did you decide if you are going sailing with us during the Air Show this weekend in Chicago?"  The next

morning, Roehm replied that she and Womack had arranged to be finished with their scheduled meeting early in the afternoon on Saturday. "We (sean and I) are free from 230 on. . ." By this time, both Roehm and Womack had also changed their plane reservations to return to Bentonville on Sunday morning instead of Saturday, resulting in additional costs to Wal-Mart.

43.    Roehm and Womack in fact met with Weisman, Howard Draft ("Draft") and another DraftFCB employee for dinner on the evening of August 19 at the LuxBar restaurant in Chicago. Earlier that week, when Weisman asked in an email if he and Draft could buy Roehm and Womack dinner, Roehm replied: "You can't buy. .we are WM." As a result, the employee at DraftFCB who made reservations at the LuxBar specifically asked for separate checks after the meal. At the end of dinner, however, when the separate checks arrived, Roehm handed hers to Howard Draft who paid for Roehm's dinner. The total dinner bill paid by Draft was over $700. Roehm and Womack then accompanied their DraftFCB dinner companions for drinks and cigars at the Peninsula Hotel where Draft again picked up the tab – this time over $440. Roehm's conduct violated Wal-Mart's gifts and gratuities policy. Notably, Roehm did not include a dinner expense on her travel expense report. But she and Womack did charge, and receive payment from, Wal-Mart for the added night of hotel expense.

44.    The dinner and the extended stay in Chicago served no legitimate company purpose. Just the opposite, Roehm and Womack used their company positions and company-paid travel to discuss post-Wal-Mart business opportunities for themselves. Weisman hinted at this the next morning when he sent the following email to Roehm and Womack: "That was fun. Fyi, Howard's car did not start but was gently moved to a safe spot. And 'What's said in Chciago [sic], stays in Chicago'." Roehm responded: "Thanks Tony – we had a great time."

She went on to discuss meeting Weisman again on September 20 in New York. She closed her email, which also was copied to Womack: "Love to continue our conversation."

45.     Womack and Roehm did not waste any time doing so. Later that same day, after returning to Arkansas, Womack sent Weisman a lengthy message from his private email account (copying the message to Roehm at her private email account) with the subject line "Continued conversation. . ." The message, signed "Sean and Julie," explored the possibility of Womack and Roehm leaving Wal-Mart and partnering with Weisman and Draft.

46.     Womack explained that he and Roehm "spent the morning talking about" their conversations with Weisman and assured him that they were "both very interested in continuing this discussion." The email praised Weisman and DraftFCB, one of the agencies Roehm and Womack were supposed to be considering in an impartial manner for the RFP process, noting that they thought DraftFCB had "the right model" and that [t]his is game-changing and something we'd love to help become a reality." It was clear that Roehm's and Womack's interest was not focused on how DraftFCB could help Wal-Mart – the "conversation" had a more personal objective. The email continued that Womack and Roehm would "like to see under the hood a bit more. Where are you headed? Vision? Next 3-5 years. Clients you covet. Ideas that are percolating. Etc." As for "timing," the message stressed that "[g]etting invovled [sic] sooner rather than later makes sense b/c the cement is setting." Womack lamented "some relational constraints on our end that make this tricky."

47.     More specifically, the message asked "What do the next 60-360 days look like for you guys? When will it be too late? I'm speaking from a business development, culture development and an equity standpoint." The equity point was stressed as an essential component of any deal that they struck. "Speaking of equity…we're both interested in having a stake in our

next gig.  I've missed out it [sic] once, so this one is mandatory next round.  More importantly to you, in the two of us you have a team that can help lead your organization in a powerful way.  But the opportunity will need to be broad enough."

48.     In the closing paragraph, the August 20 email stated that "for now this is the majority of the big important questions.  You can mull on them or answer them, but know that we'll certainly be talking about them a lot between now and the 20th.  Talk soon.  Sean & Julie.  P.S. These gmail accounts are WM safe.  So, we can have candid conversations."

49.     The conversation continued.  For example, on October 6, 2006 Roehm and Womack traveled again to Chicago.  Weisman paid for Roehm's and Womack's lunch at the Coco Pazzo Restaurant, where the tab for the three was $245.83.  That same day, Roehm joined Womack for a conversation with Howard Draft in which Womack expressed his interest in leaving Wal-Mart and working with Draft.  Ultimately, Draft determined that he could not make an employment offer to Womack while Roehm and Womack were directing Wal-Mart's agency review.  Roehm did not inform her superiors at Wal-Mart that Womack was soliciting employment with one of the agencies participating in the RFP, and neither she nor Womack removed themselves from that process.

**E.     Roehm's acceptance of gifts and gratuities**

50.     Roehm was not content to wait until after she left Wal-Mart, however, to benefit personally from DraftFCB's eagerness to win the Wal-Mart account.  The dinner at the LuxBar restaurant was just one of many instances where Roehm accepted gifts and gratuities from an outside vendor.  During one of the several occasions when Roehm had drinks with Weisman, she mentioned that she liked the "Effen" brand of vodka.  Weisman responded with a September 11, 2006 email to Draft, an investor in Effen Vodka, with the subject line "Also for Julie":  "She was

bummed that the place we went to in Houston did not serve Effen.  She put away a bottle of the Black Cherry after the night we went out, she's a big fan.  Perhaps a case for her birthday?  She doesn't seem troubled by the gift restriction policies."  Draft had his assistant send Roehm a case of the vodka in mid-September, which Roehm accepted without question, despite the Company policy against receiving gifts and gratuities.  Rather than politely decline the gift or report it to her superiors, she sent Howard Draft an email expressing gratitude for his generosity:  "[B]roke out the Rasberry [sic] Effen at my party last night," she wrote.  "HUGE hit!  Thanks very much.:)"

51.     Nor was the LuxBar dinner the only occasion where Roehm and Womack met with Weisman or other representatives of DraftFCB outside the formal agency review meetings.  Rather, from late-August through early-October 2006, hardly a week went by during which Roehm and Womack did not meet Weisman or other DraftFCB representatives, often for dinner or drinks.  For example, on August 20 (the morning after the LuxBar dinner), Roehm wrote to Weisman in an email "Thanks Tony – we had a great time.  So, let's plan to meet up again in NY on the 20th . . . one month from today . . . sound good?"  (That was the date of the Nobu dinner described below.)  Weisman wrote back, "Speaking of NY, are you guys planning to attend Fashion Week?  Want to go to the opening events on Fri, Sept 8?  I am planning to attend, can you join me?"  Roehm declined the invitation, explaining "Love to but we are in Houston for our big Holiday meeting with 15000 associates."  Weisman responded by changing his plans and traveling to Houston to entertain Roehm and Womack, including treating them to a $649.04 dinner at the Alden Restaurant on September 8.  In an email sent late in the morning of Saturday, September 9, Weisman wrote "Everybody perky this morning?  . . .  Fun night.  . . . PS, hydrate."

Roehm replied, "Thanks for a terrific time last night.  Always great to see and chat with you. . . . Talk to you next week."

52.     On at least three separate occasions between August 31 and October 26, 2006, Weisman or Draft treated Roehm and Womack to dinner at James at the Mill Restaurant in Johnson, Arkansas.  Although the average cost per person of the meals always exceeded $100, Roehm and Womack paid nothing.  One of the dinners hosted by DraftFCB was on October 9. In an email exchange following the meal, Weisman wrote to Roehm "Thanks . . . Kiddo for joining us for dinner.  Always fun.  And nice to know we CAN have ameal [sic] together without getting s-faced."  In response, Roehm wrote "Me too . . ."  She added:  "Thanks for hosting us. Keep it between us though.  Want you guys to win this fair and square!  Best of luck tomorrow!" The next day DraftFCB made its final presentation to Roehm, Womack and the rest of the Wal-Mart agency review team.

53.     Similarly, shortly after Roehm's birthday in mid-September, she and Weisman discussed getting together for dinner on September 18.  In response to Weisman's invitation, Roehm wrote in an email "Talked to the team and they don't want to create any view of favoritism so will decline on dinner.  We will call you though."  In response, Weisman wrote "Understood.  Want to do the two of you [*i.e.*, Roehm and Womack]?  Can do dinner or a drink later on if that works.  Have some fun places in mind."  Her colleagues' desire to avoid the appearance of favoritism was quickly forgotten, as Roehm wrote back, apparently referring to the case of Effen vodka, "Thanks and thanks for the surprise!  I should have guessed!!  It was so great that you and Howard thought of me.  Let's quietly touch base on Monday and plan from there . . good?"

54.    On another occasion, Roehm accepted an invitation from a different agency to lunch and a round of golf at the Rockefeller Estate's private golf course in New York.  She identified Womack as the person who would accompany her.

**F.    Roehm's public tribute to DraftFCB**

55.    On September 20, 2006, DraftFCB hosted an "AdForum conference" – a business development event in New York City attended by consultants in the advertising field.  The RFP process was nearing its completion, and DraftFCB was one of four general market agencies still being considered by Roehm and the rest of the Wal-Mart review team.  Despite the fact that Roehm was supposed to be giving impartial consideration to each of the agencies still competing for Wal-Mart's advertising work – especially as the process was entering its final stage – she spoke to the group of assembled consultants on behalf of DraftFCB, lavishly praising the agency at this public event and holding the firm out as a model for the marketing industry.

56.    In connection with the event, Roehm also attended dinner hosted by DraftFCB at New York's upscale Nobu 57 restaurant.  Most of the guests at the Nobu event were again consultants who coordinate advertising agency reviews such as the one then underway for Wal-Mart.  According to those in attendance, before the night was over, Roehm was sitting in Weisman's lap and eating food from his plate.

57.    Roehm's public tribute to DraftFCB, made in the midst of Wal-Mart's agency review process and at an event intended to tout DraftFCB to coordinators of similar ad agency competitions, was a breach of the protocols and norms of the advertising industry and cast a shadow over Wal-Mart's review.  Subsequent press reports characterized attendees as "flabbergasted" by Roehm's behavior.  "I've never seen an existing client at one of these things – much less a prospective client," said one advertising industry veteran.  According to one press

19

account, when asked why she made the remarks at the dinner honoring DraftFCB and what the effect had been on other agencies participating in the RFP, Roehm responded, "If you don't ask, you don't get."

58.    Roehm's attendance at the AdForum event and the dinner that followed was characterized as impromptu.  In fact, her participation in the event had been carefully staged by Roehm and Weisman.  As noted above, on the morning after the August 19 LuxBar dinner in Chicago at which Roehm, Womack, Weisman and Draft discussed a post-Wal-Mart business relationship, Roehm sent an email to Weisman stating "let's plan to meet up again in NY on the 20th. . . .one month from today. . .sound good?  Love to continue our conversation."  Then on August 31, Weisman emailed Roehm to orchestrate Roehm's appearance at the September 20 event and dinner.  Referring to DraftFCB's incoming New York CEO, Peter DeNunzio, he wrote:  "You will meet Peter if you are still booked to join us on Sept 20 in NY.  Plan to come to Draft office on 57th and 3rd at 5.30 to sit in the consultant presentation and then you can do a spontaneous cameo.  That evening will be a sneak peak at the new agency positioning, slated for public announcement the following morning.  Then join us for dinner at Nobu 57."  Roehm forwarded the email to Womack.  On September 6 and 7, both Roehm and Weisman confirmed the itinerary for September 20, including Roehm's attendance at the Nobu 57 dinner following the AdForum event.  And on September 9, Weisman (in an email to other members of the DraftFCB team pursuing the Wal-Mart account) wrote, "Julie is all set for her cameo in our AdForum presentation.  She'll say she believes our model is right and has been impressed with it in action."

59.    Roehm's conduct violated Wal-Mart's Statement of Ethics, which clearly instructs: "Do not have social or other relationships with suppliers, if such relationships would

create the appearance of impropriety or give the perception that business influence is being exerted." Her appearance at the AdForum event interfered with Wal-Mart's interest in conducting a fair and impartial agency review and was an extension of the discussions a month earlier in which she and Womack had sought to advance their own personal career opportunities with DraftFCB at Wal-Mart's expense.

## G. Roehm's frequent contact with DraftFCB included advice and assistance in connection with the Wal-Mart agency review

60. While Roehm and Womack were receiving meals and gifts and advancing their own possible career opportunities, they were also providing DraftFCB with information and advice about their position in the ongoing Wal-Mart agency review. At the September 8, 2006 dinner that Weisman bought for Roehm and Womack in Houston, Roehm provided valuable information about the likelihood of success for other agencies in the review and suggested tactics for such things as how to "get [the] vote" of Wal-Mart's Senior Vice President of Marketing and how to structure DraftFCB's pricing proposal to earn a greater fee from Wal-Mart. On September 25, Weisman informed several of the DraftFCB team members that Roehm and Womack would be coming to their offices on September 28. Weisman reported Roehm's and Womack's suggestions for addressing issues raised by other senior decision-makers at Wal-Mart and, in an exchange later that day with Draft, he confided: "We are leading. They are coming to help us shape the mtg on the 10th." He added later: "We have to make sure our team continues to feel like we're behind and need to take big swings. No one should now [sic] that we're winning, pls keep to your self."

61.    Similarly, in an October 12 internal email, Weisman reported to others at DraftFCB "Spoke to Sean W. tonight. . . . There is no one on the review team we need to reach out to, he said he'd tell me if there was someone we need to 'shore up' and there isn't."

62.    During the same time, Roehm provided Weisman with access to internal Wal-Mart communications discussing sales and marketing results.  For example, on October 5, 2006, Roehm forwarded to Weisman an internal email from a Wal-Mart Senior Vice President of Marketing regarding Wal-Mart's September sales performance.  The sensitive, proprietary assessments of Wal-Mart's performance and marketing strategies contained in the email were clearly not intended for outside disclosure.  Nevertheless, Roehm again placed her interest in advancing DraftFCB (and, ultimately, the career opportunities DraftFCB might offer her and Womack) ahead of her duties of loyalty and confidentiality as an officer of Wal-Mart.

63.    This was not the only time Roehm shared confidential Wal-Mart communications with DraftFCB in an effort to advance her – rather than Wal-Mart's – interests.  In late November, shortly after it was selected in the Wal-Mart agency review, DraftFCB ran a crude, self-congratulatory advertisement showing two lions engaged in sex.  The advertisement resulted in considerable negative press attention and a series of internal email communications among Wal-Mart senior executives about DraftFCB's fit for Wal-Mart's marketing work.  Unbeknownst to the Wal-Mart executives in one email exchange, Roehm blind copied Draft on the email chain followed quickly by another email warning him not to reply to the one on which he was blind copied.  Once again she placed her interest in advancing DraftFCB – and a potential career opportunity for herself and Womack – over her duties to keep confidential communications involving some of Wal-Mart's most senior executives.

**H.      Wal-Mart officials investigate conduct of Roehm and Womack**

64.     As Womack had confided to Weisman in advance, DraftFCB was selected nearly unanimously to handle Wal-Mart's general agency account.  The selection became public in late October 2006; shortly thereafter, using Wal-Mart's "open door" policy, two individuals approached senior executives of the Company to report conduct by Roehm that they believed to be in violation of Wal-Mart policies, including but not limited to the Company's gifts and gratuities and non-fraternization policies.

65.     Based on information provided by these individuals, the Company conducted a thorough review of the agency selection process and related matters.  As part of the review, Roehm and Womack were interviewed and given an opportunity to explain their conduct. During their interviews, Roehm and Womack were asked about: (a) the agency review process in general; (b) their meetings and communications with Draft about possible future employment and individual business opportunities with Draft; (c) whether the relationship between Roehm and Womack was more than an arms-length supervisor/subordinate relationship; (d) the receipt of gifts and gratuities from Draft (including vodka and watches), and other related matters. Roehm and Womack gave conflicting accounts about these matters and falsely denied having engaged in any improper conduct.  For her part, Roehm also falsely stated that she had promptly reimbursed Howard Draft in cash for two or three bottles of Effen vodka that she had asked to have shipped to her home.  In fact, as described above, Roehm had received a case of Effen vodka as a birthday gift from DraftFCB, and in an effort to conceal this improper gratuity that plainly violated Wal-Mart policy, Roehm insisted that Draft accept approximately $200 in cash only a few days before she was interviewed about her conduct.

66.    Wal-Mart terminated Roehm and Womack on December 4, 2006, based on its findings that they had violated Wal-Mart policies in various respects and had been untruthful in their statements to Wal-Mart senior executives.  Wal-Mart also announced that it would re-open the agency review process, and exclude DraftFCB from the re-opened process.

67.    Roehm and Womack's improper conduct, favoritism, and receipt of gifts and gratuities harmed the Company's image by creating an appearance that Wal-Mart's $580 million advertising budget would be awarded based on personal considerations, connections, and favoritism, rather than on efficiency, sound business judgment, and the best interests of the Company.  Moreover, their actions, once discovered by the Company, required Wal-Mart to re-open the agency review process to ensure that the selected agencies were in fact the best qualified for the work.  Re-opening the RFP imposed additional costs on Wal-Mart, including but not limited to the cost of devoting additional staff resources to the RFP and delaying the retention of an advertising agency to create and launch new marketing campaigns in the highly competitive retail sector.

I.    **After Roehm's termination, she engages in a false public relations campaign**

68.    After the termination of her employment, Roehm engaged in a persistent campaign to mislead the media and public about the reasons for her termination and to disparage the Company for which she had been an officer and fiduciary.

69.    Roehm told the media following her separation that "I was hired to do a job as a change agent," and "[m]y primary function here is done."  In fact, she was fired for egregious misconduct.  Repeatedly, Roehm and Womack told representatives of the media that they engaged in no wrongdoing.  For example, the Wall Street Journal reported that in an interview Roehm "flatly denies any affair and says she has tried to comply with company policies.  Mr.

Womack also denies any affair or any improper behavior."  Gary McWilliams, Suzanne Vranica & Neal E. Boudette, *How a Highflier in Marketing Fell at Wal-Mart*, WALL ST. J., Dec. 11, 2006.

70.    Nearly two months after Roehm's suit was filed, and in the face of her media campaign accusing Wal-Mart of firing her for reasons unrelated to her misconduct, the Company responded to numerous inquiries by stating it had irrefutable evidence of an inappropriate relationship between Roehm and Womack.  In an interview conducted jointly with Womack, Roehm tried to downplay the significance of this evidence.  "Julie, ever bold, held steady.  She knew what Wal-Mart had.  'It will look sensational, but its irrefutable evidence that we're really good friends,' she said.  'He's like a brother to me.'"  Steve Fishman, *Snakes in the Garden*, NEW YORK MAGAZINE, Feb. 2007.

71.    Roehm also has suggested publicly that her termination was the result of a lack of support by Wal-Mart's senior executives, a lack of teamwork, a lack of communications and commitment on the part of Wal-Mart to innovation or change, and internal political (rather than her own ethical) conflicts.  Yet, such assertions are belied by Roehm's own statements during her employment.  In one email exchange from October 2006 with a Senior Vice President in Wal-Mart's marketing group, for example, Roehm wrote "You and I have come a long way and I feel really good about how we are working together and collaborating.  It feels like a team."

### COUNT ONE:  BREACH OF FIDUCIARY DUTY – DUTY OF CARE

72.    Wal-Mart incorporates the allegations of paragraph 1 through 71 of its Counterclaim as if fully set forth herein.

73.    As an officer and fiduciary of Wal-Mart, Roehm owed a duty of care that required, *inter alia,* that she discharge her duties and contractual agreements in good faith and

with the care that an ordinarily prudent person in a like position would exercise under similar circumstances and in the best interests of the Company.

74.    By failing to avoid conflicts of interest, maintaining inappropriate relationships with suppliers, receiving gifts and gratuities from suppliers, using her position and company resources to further her own career interests and romantic engagements, mismanaging Wal-Mart assets, maintaining an inappropriate romantic relationship with a subordinate, and lying about her activities when later questioned by Wal-Mart officials, Roehm violated her employment agreement and various Company policies and breached her fiduciary duty to the Company.

75.    Through her mismanagement and misappropriation of Company assets, improper contacts, acceptance of gifts and gratuities, and jeopardizing of Wal-Mart's advertising agency review process, Roehm violated her duty of care in a manner that required the agency review process to be re-opened and caused the Company to incur substantial and otherwise unnecessary costs and expenses.

76.    By reason of Roehm's breach of fiduciary duty, Wal-Mart has sustained damages, which include additional costs, lost opportunities, economic losses, monetary damages, harm to its public image, attorneys' fees, and other consequential losses.

## COUNT TWO:  BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY

77.    Wal-Mart incorporates the allegations of paragraph 1 through 76 of its Counterclaim as if fully set forth herein.

78.    As an officer and fiduciary of Wal-Mart, Roehm owed a duty of loyalty that required, *inter alia*, that she act on behalf of the Company and refrain from self-dealing, usurpation of Company opportunities, and any other acts that would permit her to receive an improper personal benefit at the expense of her employer or to harm her employer by pursuing her own personal self interest.

26

79.    Roehm breached her duty of loyalty to Wal-Mart through improper favoritism toward certain agencies, the acceptance of gifts and gratuities during the agency review process, and by using company resources, her position, and the power and influence she derived from the agency review process to pursue future career and financial opportunities for herself and the subordinate with whom she was romantically involved.  During that process, Roehm engaged in a pattern and practice of behavior intended to further her own interests, notoriety, and romantic pursuits at the expense of the Company and of the review process for which she was responsible. Roehm's actions ultimately caused the highly public rescission by the Company of the selection decision produced by the agency review process and sustained negative attention to Wal-Mart's marketing department and efforts.

80.    During the agency review process, Roehm was in frequent communication with DraftFCB, which discussions included topics disloyal to Wal-Mart, including pursuit of employment opportunities with DraftFCB or an affiliated agency.

81.    Through Roehm's improper acts that created an appearance of favoritism toward DraftFCB at the expense of Wal-Mart, Roehm violated her duty of loyalty.

82.    By reason of Roehm's breaches of fiduciary duty, Wal-Mart has sustained damages, which include additional costs, lost opportunities, economic losses, monetary damages, harm to its public image, attorneys' fees, and other consequential losses.

## PRAYER FOR RELIEF

WHEREFORE, Wal-Mart prays for relief as follows:

(a)    that Wal-Mart's Counterclaim against Roehm be granted with an award of damages, in an amount to be established at trial, including an award of prejudgment interest;

(b)    that Roehm be required to pay the costs and expenses, including attorneys' fees, that Wal-Mart has incurred in defense of this proceeding and in stating a Counterclaim against Roehm; and

(c)    that Wal-Mart receive such other and further relief as this Court deems just and proper.

Dated:  April 24, 2007

Respectfully submitted,

DYKEMA GOSSETT PLLC


s/Debra M. McCulloch
Debra M. McCulloch (P31995)
Joseph A. Ritok, Jr. (P25472)
Attorneys for Defendant
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48304
(248) 203-0786
dmcculloch@dykema.com

GIBSON, DUNN & CRUTCHER LLP

s/with consent of Karl G. Nelson
Eugene Scalia
Karl G. Nelson
David J. Debold (P39278)
Of Counsel for Defendant
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-9500
EScalia@gibsondunn.com
Counsel for Defendant, Wal-Mart Stores, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: John F. Schaefer (P19948) at bar@lfjfs.com and B. Andrew Rifkin (P46147) at bar@lfjfs.com, Eugene Scalia at EScalia@gibsondunn.com and to Sam Morgan (P36694) smorgan@sommerspc.com.

s/Debra M. McCulloch
Dykema Gossett PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48304-5086
(248) 203-0785
E-mail:  dmcculloch@dykema.com
P31995

BH01\706831.2
ID\DMM

29