# UNITED STATES DISTRICT COURT
# IN THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JULIE ANN ROEHM,

        Plaintiff,

                                    Case No. 07-CV-10168

-vs-                                HON. LAWRENCE P. ZATKOFF

WAL-MART STORES, INC.,

           Defendant.

---

SOMMERS SCHWARTZ, P.C.
BY:   SAM G. MORGAN (P36694)
       KEVIN J. STOOPS (P64371)
**Attorneys for Plaintiff**
2000 Town Center
Suite 900
Southfield, Michigan 48075
(248) 936-2148

THE LAW FIRM OF JOHN F. SCHAEFER
BY:   JOHN F. SCHAEFER (P19948)
       B. ANDREW RIFKIN (P46147)
**Attorneys for Plaintiff**
380 North Old Woodward Ave.
Suite 320
Birmingham, Michigan 48009
(248) 642-6655

DYKEMA GOSSETT PLLC
BY:   DEBRA M. McCULLOCH (P31995)
       JOSEPH A. RITOK, JR. (P25472)
**Attorneys for Defendant**
39577 Woodward Avenue
Suite 300
Bloomfield Hills, Michigan 48304
(248) 203-0785

GIBSON, DUNN & CRUTCHER, LLP
BY:   EUGENE SCALIA
       KARL G. NELSON
       DAVID J. DEBOLD (P39278)
**Of Counsel for Defendant**
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

---

# PLAINTIFF'S REPLY TO
# DEFENDANT'S COUNTERCLAIM

Dockets.Justia.com

**NOW COMES** PLAINTIFF, JULIE ROEHM, by through her attorneys, SOMMERS SCHWARTZ, P.C., and THE LAW FIRM OF JOHN F. SCHAEFER, and for her Reply to Defendant's Counterclaim, she respectfully submits unto this honorable Court as follows:

## I.  Introduction

1.      In answering paragraph 1, Plaintiff admits that corporate executives are held to an especially high standard in many circumstances.  In some circumstances, their actions may affect the lives and well-being of employees and shareholder. Roehm's conduct and actions in dealing with the public, customers, and contractors to benefit Wal-Mart throughout the course of her employment far exceed the standard of conduct and actions set by other executive employees of Wal-Mart.

2.      In answering paragraph 2, Roehm agrees that she was the Senior Vice President for Marketing Communications at Wal-Mart, beginning in 2006. At her previous employer, Daimler-Chrysler, she managed Chrysler's marketing communications department, with a budget of more than $2 billion, more than three times the size of her new department at Wal-Mart.  At Chrysler, she directed overall development and integration of advertising, merchandising, licensing, events, auto shows, motor sports, internet, games, promotions, and media across all Chrysler brands both in the U.S. and around the globe. Roehm also managed dealer retail distribution advertising and marketing tactics, and devised broad development and communications strategy. In light of this experience, Roehm did not hesitate to take over responsibility for managing Wal-Mart's relationships with outside advertising agencies. She was the senior member of the Agency Selection and Review Committee, which was composed of Roehm, Rex Conklin, Barry Moehring, Raul Vazquez, and Sean Womack.  That

committee evaluated more than 30 advertising agencies – including "Chemistry Checks" and "Tissue Sessions" – as part of the process to select an advertising agency partner best suited to help Wal-Mart address marketing issues and criteria and achieve its objectives and goals in marketing. Wal-Mart's marketing issues, criteria, objectives and strategies were established by the Senior Vice President of Marketing, Stephen Quinn, Steve Bratspies, and Tony Rogers. The customer segmentation research was established by Robert Atencio, who reported directly to Stephen Quinn. Under the agreement between Roehm and Wal-Mart, Roehm was supposed to be fairly compensated for executing her responsibilities and foregoing continued employment with Daimelr-Chrysler, but Wal-Mart did not fulfill its obligations under that agreement, so Roehm has not been fairly compensated.[1]

3.      In answering paragraph 3, Roehm denies that she violated any of her fiduciary duties or responsibilities to Wal-Mart. Indeed, based on marketing strategies created by Stephen Quinn and the employees that reported to him, Roehm developed and implemented communications strategies and tactics. She never put her own interests first, although other executive employees of Wal-Mart did on a frequent basis. Roehm never created or initiated situations that would create a conflict of interest or an appearance of a conflict of interest. It is ironic that Wal-Mart would plead that Roehm

---

[1]     While at Chrysler, Roehm was publicly recognized with numerous awards. For example, in August of 2004, Roehm was named as the Marketing All-Star for 2004 by *Automotive News*. In October, Roehm was named Automotive Marketer of the Year by *Brandweek*. Roehm also was awarded Working Mother's Top 25 Women of 2004. This was succeeded by an initiation into the AAF Advertising Hall of Achievement for outstanding performance in the field of marketing and advertising to executives under 40 years old, an induction is given to seven individuals annually. In 2004, Roehm was the only client inductee.

Roehm's most recent accolades include the induction into the Automotive Hall of Fame, which took place in September of 2005, and her receipt of the honor of Top 100 Most Influential Women in the Automotive Industry, which was the feature story in Automotive News in September of 2005. Also, in November of 2005, under Roehm's leadership, Chrysler was named Interactive Marketer of the Year by *Ad Age*. In January of 2006, just before Wal-Mart hired her, Roehm was named as runner-up Corporate Media Executive of the Year by the Delaney Report.

did not act as a model for company employees, since in November of 2006, John Fleming, who at that time was the Executive Vice President and Chief Marketing Officer, chose to have Roehm act and appear as Wal-Mart's public spokesperson for Wal-Mart's Christmas campaign. In that capacity, Roehm appeared on *The O'Reilly Factor*, *Fox and Friends*, and various broadcast network news programs. After those appearances, during the weekly Officers' Meeting, Roehm was lauded by Celia Swanson, Senior Vice President for Operations, and applauded by the approximately 300 corporate officers in attendance, for Roehm's work as Wal-Mart's Christmas campaign spokesperson. It is clear that Roehm was terminated for being an "agent of change" and an "envelope pusher," since immediately following her departure, Wal-Mart returned to its old (price-based) advertising strategy, and her entire department was restructured by Wal-Mart in an effort to minimize the importance of Marketing Communications as a strategic pillar of the overall marketing department at Wal-Mart. It is obvious that Wal-Mart was trying to eliminate the ideas that Roehm was advocating. Since to this day, Wal-Mart never has told Roehm directly why she was terminated, Roehm lacks knowledge or information sufficient to respond to Wal-Mart's broad, unsupported statement that she was terminated for violating any duties or standards of conduct at Wal-Mart.

4.    In answering paragraph 4, Roehm (1) denies that she engaged in any inappropriate dealings or relationships with any advertising agencies seeking to do business with Wal-Mart, (2) denies that she used her position and authority to secure personal benefits from potential suppliers and did not accept and retain items for which she did not pay, nor did she solicit employment opportunities from a supplier, (3) denies that she expended Wal-Mart time and resources in the course of an inappropriate romantic relationship, and (4) denies that she lied about the activities raised by subsections (1) through (3), above, when questioned by Wal-Mart officials.

## II.  Parties

5.      In answering paragraph 5, Roehm admits the allegations contained therein.

6.      In answering paragraph 6, Roehm denies that her complaint alleges that she resides in the City of Rochester Hills, Michigan.  Roehm's complaint only alleges that she maintains a residence there.  In fact, since February 6, 2006, Roehm has been, and continues to be, a resident of the state of Arkansas.  Roehm established her domicile in Arkansas when she and her family moved to Arkansas with the intent to remain there indefinitely.  Roehm admits that from February 6, 2006, until December 4, 2006, Roehm was employed by Wal-Mart.  (Please see Exhibit A to Plaintiff's First Amended Complaint).

## III.  Jurisdiction and Venue

7.      In answering paragraph 7, Roehm admits that she initially filed this action in the Circuit Court for the County of Oakland because that is where the parties' agreement was executed.  On January 10, 2007, Wal-Mart removed the action to the United States District Court for the Eastern District of Michigan.  However, this Court does not have jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are not citizens of different states.  Both parties are citizens of the state of Arkansas.

### IV.  Wal-Mart's Statement of Ethics and Corporate Policies

8.      In answering paragraph 8, Roehm lacks knowledge or information sufficient to form a belief as to the truth of all the matters asserted.  While Wal-Mart's counterclaim suggests that its officers should not be swayed by personal gratuities and considerations, its executives do in fact accept personal gratuities and considerations, and create the appearance of impropriety, as described below.

9.      In answering paragraph 9, Roehm lacks knowledge or information sufficient to form a belief as to the truth of all the matters asserted.  However, regardless of Wal-Mart's Statement of Ethics ("Statement"), many Wal-Mart executives do not abide by Wal-Mart's allegedly "firm" policy forbidding conflicts of interest.  By way of example, but not by way of limitation, instead of "avoid[ing] situations and relationships that involve actual or possible conflicts of interest," H. Lee Scott, the current President and Chief Executive Officer of Wal-Mart, initiated (at a time when Mr. Scott was the Vice-President of Merchandising) an association with entrepreneur Irwin Jacobs, allowing Mr. Jacobs' business, *Jacobs Trading Company* (JTC), the exclusive right to purchase unsold Wal-Mart merchandise.  *Jacobs Trading Company* is one of several privately-held companies owned by Mr. Jacobs.  Upon information and belief, Mr. Jacobs also owns or owned interests in approximately 12 boat manufacturing companies, and as part and parcel of Mr. Scott's relationship with him, over the span of several years, Mr. Scott has purchased from Mr. Jacobs' companies a number of yachts at preferential prices.  Upon information and belief, Mr. Scott also was also able to purchase, through his relationship with Mr. Jacobs, a large pink diamond for his wife at a preferential price.

10.     In answering paragraph 10, while Wal-Mart's counterclaim suggests that "[a] conflict situation can arise if you take actions or have interests that are inconsistent with the interests of Wal-Mart or that may interfere with your ability to perform your job

effectively on behalf of the Company" and that "[y]ou may not take any opportunities or use any confidential information for your benefit … that you discover or obtain through your employment with Wal-Mart," many of its executives in fact do exactly the opposite. By way of example, but not by way of limitation, Mr. Scott's son, Eric S. Scott, who initially was employed by Wal-Mart as a buyer, ultimately left Wal-Mart for employment with *Jacobs Trading Company*, a company which purchases unsold Wal-Mart merchandise from Wal-Mart and which is owned by Mr. Jacobs, whose relationship with Mr. Scott is described above. Wal-Mart has chosen to ignore the fact that Mr. Scott's circumstances create "[t]he appearance of conflict [which] may be just as damaging to Wal-Mart's reputation as an actual conflict."

11.    In answering paragraph 11, Roehm lacks knowledge or information sufficient to form a belief as to the truth of all the matters asserted. However, actions apparently speak louder than words at Wal-Mart. While Wal-Mart asserts that it has policies which prohibit conflicts of interest and the misuse of Wal-Mart assets and opportunities, those policies do not seem to prevent its executives from using both to personal advantage. By way of example, but not by way of limitation, upon information and belief, E. Stanley Kroenke is a cousin by marriage to a descendant of Wal-Mart founder. Mr. Kroenke, a former director of Wal-Mart, owns approximately 55 Wal-Mart stores around the country. Many of the leases for the Wal-Mart stores Mr. Kroenke owns – and leases back to Wal-Mart – are at preferential rates. Similarly, by way of example, but not by way of limitation, upon information and belief, Thomas Seay, Wal-Mart's former Executive Vice President of Real Estate, also owned Wal-Mart stores while employed as a Wal-Mart executive, and his subordinate Wal-Mart employees were put in the position of having to "negotiate" lease terms for Wal-Mart stores with him. Mr. Seay, when he left Wal-Mart, entered into numerous joint ventures with Mr. Kroenke related to Wal-Mart stores.

12.    In answering paragraph 12, while Roehm admits that Wal-Mart accurately has quoted the statement, Roehm denies that the statement is a truthful representation of Wal-Mart's actual business practices.  Wal-Mart executives and family members apparently have been exempt from Wal-Mart's requirement that its officials must "[a]void conflicts of interest in supplier selection, such as directing business to a supplier owned or managed by a relative or friend…" or would "… give the perception that business influence is being exerted."  By way of example, but not by way of limitation, upon information and belief, Mr. Scott was provided jet aircraft travel (for his own personal use) on private airplanes provided by Mr. Jacobs.  The private airplanes frequently were used for Mr. Scott and his wife to travel to their residences in Longboat Key, Florida and Las Vegas, Nevada.

13.    In answering paragraph 13, Roehm lacks knowledge or information sufficient to form a belief as to the truth of whether this policy is "well-known."  Roehm denies that the statement is a truthful representation of Wal-Mart's actual business practices.  Wal-Mart executives disregard Wal-Mart's stated requirement that its officials must not "accept[] gifts or gratuities from vendors who do, or seek to do, business with the Company…," including "tickets to entertainment events" and "liquor and meals."  By way of example, but not by way of limitation, upon information and belief, in June of 2006, John Fleming, Wal-Mart's Executive Vice President of Marketing, Steve Bratspies, its Vice President of Marketing, David Porter, its Vice President of Merchandising, Raul Vazquez, its Vice President of Wal-Mart.com, and Greg Hall, its Director of Electronics Marketing, flew to Barcelona, Spain to meet with representatives from Tyson Foods, Hanes, other vendors, and Irving Azoff, the entertainment manager of the Eagles.  Wal-Mart officers were given tickets for an Eagles concert (with a face value of $300.00 per ticket), along with back stage passes and souvenirs.  Upon

information and belief, none of the officers ever returned "[a]ny gift or gratuity received … with an explanation of this policy."

14.    In answering paragraph 14, while Roehm admits that Wal-Mart accurately has quoted the statement, Roehm denies that the statement is a truthful representation of Wal-Mart's actual business practices.  Despite Wal-Mart's stated policies, its executives do use Wal-Mart property for personal gain, as described above.

15.    In answering paragraph 15, while Roehm admits that Wal-Mart accurately has quoted the statement, Roehm denies that the statement is a truthful representation of Wal-Mart's actual business practices.  Wal-Mart officers have "become romantically involved with an Associate he or she supervises whose terms and conditions of employment he or she may have the ability to influence…" without being subject to "immediate termination."  By way of example, but not by way of limitation, upon information and belief, Robert Rhoads was variously a Vice President and Senior Vice President, General Counsel, and Corporate Secretary for Wal-Mart from 1988 through 2002.  Mr. Rhoads had an affair with Lauren Beamon, a subordinate employee in the Wal-Mart legal department.  Mr. Rhodes paid for her apartment and college tuition, divorced his wife, and subsequently married Ms. Beamon.  Mr. Rhoads was not subject to "immediate termination," even though it was known that he and Ms. Beamon had married and that he had been her supervisor at Wal-Mart.

16.    In answering paragraph 16, Roehm denies these allegations as untrue, as described above.

## V.  Roehm's Conduct During Her Employment With Wal-Mart

*A. Roehm and Womack commence employment with Wal-Mart*

17.    In answering paragraph 17, Roehm admits that on January 13, 2006, she entered into an at-will employment agreement with Wal-Mart to serve as Senior Vice President, Marketing Communications, and that she initially or eventually was assigned the asserted responsibilities.

18.    In answering paragraph 18, Roehm can neither admit nor deny the allegations as asserted.  Terry Nannie and Sean Womack were the two people directly reporting to Roehm (other than Roehm's assistant), both of whom were assigned to Roehm in the newly-created Marketing Communications department.  Shortly after Roehm arrived at Wal-Mart, she began her work by meeting with Mr. Nannie and Mr. Womack to begin to outline short-term opportunities, organizational introductions, and general Wal-Mart initiatives.  After having met Mr. Womack on one occasion and speaking to him no more than a handful of times, Roehm was relieved to learn that there was someone on her staff with Marketing Communications experience who understood the discipline of the business.  Roehm wrote an e-mail to Mr. Womack stating that she was "happy" that he had previous experiences that would benefit the new department so that she would have more knowledgeable resources to set up her new department quickly and catch up to her counterpart, Stephen Quinn, the Senior Vice President of Marketing Strategy for Wal-Mart.  Mr. Quinn was assigned five subordinates, all of whom followed Mr. Quinn from his previous employer.  Those five subordinates gave Mr. Quinn a significant advantage in establishing his department and fulfilling his mission, and Roehm, with far fewer senior staff members assigned to her department, needed experienced assistance from those working with her in the new and relatively-understaffed Marketing Communications department to accomplish Roehm's

assigned mission at Wal-Mart.  Mr. Womack initially was working for Wal-Mart on a contract basis; only in the early summer of 2006 did he become a Wal-Mart employee, as described below.

19.    In answering paragraph 19, Roehm can neither admit nor deny the allegations as asserted.  When Roehm began her work at Wal-Mart, she encountered almost immediate resistance to her mission.  Thus, Roehm utilized a team-oriented approach to create in her department a more casual atmosphere to allow her team members to execute their responsibilities, while she managed outside influences and provided insight and leadership.  The collegial nature of the e-mails between Roehm and the staff reporting to her is typical of Roehm's management style, and Roehm exchanged similar e-mails with other colleagues and direct reports at Wal-Mart, just as she did at her previous employer.  In Roehm's view, this approach was especially important at Wal-Mart, in light of the animosity towards Marketing Communications that manifested itself shortly after Roehm's arrival at Wal-Mart.  Within only a few months after her termination, Mr. Scott admitted to *BusinessWeek Online* that he "didn't care about advertising."  Not surprisingly, that sentiment filtered down throughout Wal-Mart's executive officers, and Roehm almost immediately began to experience significant resistance to her mission.  Roehm reported this animus to her supervisor, John Fleming, where on one occasion in March of 2006, she asked Mr. Fleming whether he really even intended for Roehm to pursue and succeed in accomplishing her assigned mission.  In this context of hostility towards her mission, Roehm reinforced to her staff that the Marketing Communications organization members must "… take care of each other…it's the only way through this," and as a result, Roehm's relationship with Mr. Womack and the other members of her team close-knit and friendly.

20.    In answering paragraph 20, Roehm admits that Womack began an employment relationship with Wal-Mart in the early summer of 2006, although Mr. Fleming and Fred Ley, Wal-Mart's Senior Vice President of Recruiting, negotiated the terms of Mr. Womack's employment relationship.  Mr. Womack was hired by Wal-Mart because one of Roehm's responsibilities was to develop an organization for Marketing Communications within Wal-Mart.  In doing so, she identified the need for a lead for the Communications Strategy function.  Roehm's previous employers had utilized a Communications Strategy lead, and this position was recommended as a benchmark in third-party research reports submitted by organizations such as the Executive Conference Board.  The person that Mr. Womack temporarily replaced had a background best suited for Creative Services, which left a vacancy in the Communications Strategy lead.  Roehm did not make the decision to hire Mr. Womack. Instead, Mr. Fleming suggested that Patsy Hauer, whom Mr. Womack temporarily replaced, was best suited in her given role of Creative Services lead, and that Mr. Womack would be a prime candidate for the Communications Strategy lead, in light of Mr. Womack's agency background, his creative skills, and other work that that Mr. Womack had done for Mr. Fleming in a project that Mr. Fleming was spearheading.  In hiring Mr. Womack, Mr. Fleming told Mr. Womack that that this new department was a "start-up in the midst of the world's largest turn-around."

21.    In answering paragraph 21, Roehm lacks knowledge or information sufficient to form a belief as to the truth of the matters asserted.  However, Roehm fulfilled all duties that she owed Wal-Mart.  Wal-Mart, however, failed to fulfill the duties it owed to Roehm.

B. Roehm assumes responsibility for Wal-Mart's advertising agency review process

22.    In answering paragraph 22, Roehm can neither admit nor deny the allegations as asserted.  Shortly after Roehm's arrival at Wal-Mart, a process was initiated to identify, select, and retain multiple advertising agencies to handle Wal-Mart's advertising accounts.  The reported budget was approximately $580 million.

23.    In answering paragraph 23, Roehm can neither admit nor deny the allegations as asserted.  Roehm assumed the lead responsibility for the agency review process precisely because of her extensive experience, background, and qualifications, as described in detail above.

24.    In answering paragraph 24, Roehm can neither admit nor deny the allegations as asserted.  Mr. Womack was added to the agency review team because he had significant experience with the agency review process from the other side of the business, having worked at a number of agencies that had undertaken the process of bidding for advertising accounts from large companies.  Mr. Fleming, and not Roehm, finalized the agreement to bring Mr. Womack to Wal-Mart, having frequent conversations with Mr. Ley, the Senior Vice President of Recruiting and Mr. Womack to negotiate the terms of the arrangement.  Mr. Fleming hired Mr. Womack specifically because of his extensive background and experience.  Before he began his employment at Wal-Mart, Mr. Womack was the global creative director for Saatchi & Saatchi X, in Fayetteville, Arkansas.  He was responsible for a creative staff of more than 250 employees, managing the staff's entire work product.  In the eighteen months that he was at Saatchi & Saatchi X, Mr. Womack opened more than fifteen offices around the world for that agency.  He "pitched" and won new business for the agency, resulting in a 100% revenue increase during his tenure.  His past clients at the agency included Procter & Gamble, American Express, Novartis, Hallmark, Coca-Cola, and Tyson Foods.  Moreover, he already had worked directly with Wal-Mart, improving its in-

store communication architecture. When Mr. Womack joined Roehm's team at Wal-Mart, Roehm again reinforced her philosophy that she was the leader of a team, and she wrote to Mr. Womack to assure him that while he was making a decision to leave a very senior and influential position within the agency system, his new position at Wal-Mart would be one where he would be treated as an equal and a friend, a sentiment Roehm shared with other members of her Wal-Mart Marketing Communications team.

C.    *Roehm and Mr. Womack work together to promote Wal-Mart's interests and complete the extensive work that Roehm was hired to do*

25.    In answering paragraph 25, Roehm can neither admit nor deny the allegations as asserted. Roehm was Mr. Womack's direct supervisor during the time that he worked at Wal-Mart. Roehm was hired to help to implement sweeping change within Wal-Mart, and specifically within the marketing department, which recently hired a new Chief Marketing Officer to create a world-class marketing organization, something Wal-Mart never had. Roehm was charged with designing a Marketing Communications Department, which to this point simply did not exist at Wal-Mart. To implement this department, Roehm recruited and hired people for new positions such as the Director of Internal Communications, who would streamline and manage the messages being sent to Wal-Mart's 1.8 million employees. Roehm also hired a Vice President of Shows and Events, whose work resulted in efficiencies and significant cost savings across all of the Sam's Club and Wal-Mart stores. Roehm hired a Vice President of Communications Architecture, along with five Directors of Communications, all of whom were to partner with the marketing strategy group to create communication strategies and media plans to best drive key messages and measure the results of these efforts with targeted Wal-Mart customers. In addition to these responsibilities, Wal-Mart asked Roehm to find efficiencies and opportunities for consistency of Wal-Mart's marketing messages and

appearances.  The primary area of concern for Wal-Mart was within the stores themselves.  Roehm implemented new programs to streamline the number of sign types, and a color palette was created for a more consistent look and feel.  In addition to all of these other responsibilities, Wal-Mart required Roehm to spearhead a comprehensive agency review, the first in the company's history.  This process was an extraordinarily extensive undertaking, which included requests for proposals for agency consultants as well as the ensuing request for proposal reviews, "chemistry checks," "tissue sessions," conference calls, and "question and answer" meetings for advertising, media, interactive, direct marketing, in-store, promotional, Hispanic, Asian, and African American agencies.[2]  The exhaustive, seven-month search included reviews of over 45 agencies, requiring extensive travel to conduct in-depth reviews of the agency facilities, cultures and capabilities of organization under consideration.  At the end of this process, the ten members of the executive marketing organization – including the Chief Marketing Officer and Senior Vice President of Strategy – voted to select the winning agency.  The agency that was chosen (the same agency that had been originally awarded with the coveted Agency of the Year award for 2006) won by a vote of nine-to-one, with Roehm voting last.  While managing all of these critical responsibilities at Wal-Mart, Roehm also spearheaded efforts that successfully improved Wal-Mart's bottom-line results, such as the HDTV campaign that led to year over-year sales improvements of 200%.  She also led the team that designed the Back-to-School online program, the

---

2     In April of 2006, after Roehm had been at Wal-Mart for just two months, Mr. Fleming asked Roehm to co-lead the agency review with Barry Moehring and Raul Vazquez.  *Advertising Age* reported the review to be valued at approximately $580 million, making it the largest agency review of the advertising industry so far in 2006.  In order to begin the process and receive proper guidance, the three-member team embarked upon a process to seek out and interview advertising search consultants.  Several search consultants were recommended, and as a result of a Request for Proposal, the search consultants were interviewed by the three-member team.   Roehm, Mr. Moehring, and Mr. Vazquez all agreed that Select Resources International (SRI) was the best choice as an external consultant to help to guide the agency review process.  The hiring of SRI led to the development of a Request for Proposal for agencies meeting the general criteria developed by the three-member team.  The agencies responses to the initial Requests for Proposals were reviewed by the three-member team, along with Rex Conklin and Sean Womack.

Holiday integrated marketing communications program, and the development of the first-ever youth-targeted program, which was wrapped in two iconic figures named Wally and Marty. This program delivered excellent results, both in-store and online.[3]

26.    In answering paragraph 26, Roehm can neither admit nor deny the allegations as asserted. In the context of all of Roehm's responsibilities at Wal-Mart, she needed to work very closely with Mr. Womack (and her other team members) to accomplish all that she did in such a short period of time. Further, Roehm was not concerned that those who did not know or have experience with the work that they were doing believed that they spent too much time together.

27.    In answering paragraph 27, Roehm can neither admit nor deny the allegations as asserted because they are argumentative. It was customary that either Roehm's or Mr. Womack's assistant would book their travel simultaneously, as their travel budgets came from the same department. Roehm admits that she and Mr.

---

3    In addition to all of her other responsibilities, Roehm also was charged with responsibility for semi-annual employee meetings, media events, and annual shareholder gatherings. Within her first 100 days, Roehm successfully designed and created a Broadway musical, which was done within the same cost structure as previous years' PowerPoint presentations and staging. This event was received with accolades from Rob Walton and Lee Scott, and was portrayed positively in the *New York Times* as evidence that the long-awaited cultural change that Wall Street had demanded at Wal-Mart finally was beginning to take root.

At the same time, Roehm was working to achieve significant cost savings for Wal-Mart. For example, almost immediately after Roehm was hired, Roehm reviewed the production of a proposed advertisement (which had been pre-approved before Roehm started working at Wal-Mart). In her first meeting with the agency, the staff presented its concept and production cost estimate of nearly $1.4 million. The agency staff told Roehm that the estimated cost was just slightly more expensive than the same advertisements the agency previously had produced for Wal-Mart in this same campaign. In light of Roehm's extensive advertising experience, Roehm felt that for the objectives of this particular Wal-Mart advertisement, the proposed cost simply was unacceptable. Roehm inquired as to whether Wal-Mart even had purchasing function to oversee such costs and to ensure that a three-bid process was used. She discovered that function did not exist at Wal-Mart. Roehm immediately worked with the agency to reduce the talent cost, the number of days of shooting, and some of the equipment to be used. She achieved almost $400,000 in cost reductions within that same meeting. Immediately after that meeting, Roehm also hired a third-party advertising production audit team to monitor all of Wal-Mart's ongoing production costs and to ensure that Wal-Mart achieved the best possible pricing for its work.

Womack had several discussions and some e-mail exchanges (such as the excerpted exchange quoted) about the need to spend more time working together and/or meeting after work hours.

28.     In answering paragraph 28, Roehm can neither admit nor deny the allegations as asserted.  On Saturday, August 5, 2006, Roehm had dinner with her family and a friend (not Mr. Womack) at a restaurant in Fayetteville, Arkansas.  Later that evening, Roehm met Mr. Womack and another newly-hired colleague for drinks at a bar.  At one point, Roehm and Mr. Womack left their table together to go the restrooms, both of which were located in a crowded hallway in another part of the bar.  While Roehm was waiting in line for the women's bathroom to become unoccupied, Mr. Womack walked out of the men's bathroom and was talking to Roehm when their newly-hired colleague walked past them in the hallway.  At no time did Mr. Womack "pin" Roehm against the wall in an "intimate pose."  Nor did their newly-hired colleague pause and announce himself; rather, he walked past Roehm and went into the men's bathroom.

29.     In answering paragraph 29, Roehm can neither admit nor deny the allegations as asserted.  This paragraph alleges events that occurred between Mr. Womack and his wife, of which Roehm has no personal knowledge.  Roehm can say that Mr. Womack, from time to time, stated that he and his wife were having marital difficulties, and Roehm and Mr. Womack on occasion exchanged e-mails about that subject.

30.     In answering paragraph 30, Roehm can neither admit nor deny the allegations as asserted.  At her deposition, Shelley Womack testified that in 2007 – after Wal-Mart already had terminated Roehm – Tom Mars, Wal-Mart's General Counsel, spoke with Mrs. Womack, looking for evidence to use a pretext for Wal-Mart's

termination of Roehm and Mr. Womack. Mrs. Womack testified that she produced the quoted message. Mrs. Womack further testified as follows:

> Q. Aside from the document that's been marked as Exhibit 1, did you give [Wal-Mart General Counsel Tom] Mars any additional documentary evidence?
>
> A. No. There was the only one [e-mail given to him].
>
> Q. I think you testified earlier that there was another e-mail that you had.
>
> A. Yes.
>
> Q. That he said [Wal-Mart General Counsel Tom Mars] didn't feel would be incriminating?
>
> A. Yes.
>
> Q. Tell me about that e-mail.
>
> A. That was a -- it appeared to be kind of like a journal writing that Sean had written to Julie. And -- and I was recalling some of the things that were on there. I don't remember specifically, but it was basically Sean saying, you know, I'm concerned about my future, I'm unhappy, I don't know where I'm headed next. We did -- Sean is a very -- that's how he processes information is through writing. So it was more of him just kind of getting some thoughts on paper. It wasn't necessarily incriminating in terms of their relationship. And her name was -- the piece that I had printed didn't even have her name on there, and so when I told Tom I have this document and the -- the other one, he felt like the other one wouldn't necessarily be helpful in this case, so I don't have that document anymore.

31.     In answering paragraph 31, Roehm can neither admit nor deny the allegations as asserted. Mrs. Womack stated in her deposition that Mr. Womack at first admitted to an affair, but then he later denied it. Despite Wal-Mart's accusations about the Womacks' intimate personal relationship, Mr. and Mrs. Womack remain married.

32.    In answering paragraph 32, Roehm can neither admit nor deny the allegations as asserted.  Further, as a pretext for terminating Roehm, Wal-Mart retrospectively has attempted to create a case after the fact.

33.    In answering paragraph 33, Roehm can neither admit nor deny the allegations as asserted.  Further, Roehm had a discussion with Mr. Womack's friend in September of 2006 about the situation surrounding Mr. Womack, his wife, and their marital difficulties.  The friend told Roehm that he was unhappy with Mr. Womack and felt that Mr. Womack should be confiding in him more.  The friend spoke about the Womacks' personal family issues and said that he and his wife were surprised that the Womacks had remained married for as long as they had been, and that there had been issues with the Womacks' marriage for many years.  The friend specifically cited the fact that the Womacks never fought as one of the key indicators that the friend and his wife believed that the Womacks' marriage was dysfunctional.  At this point, Roehm indicated that she would feel terrible if the current situation had further complicated the Womacks' issues and she hoped that they would work it out.  Roehm never "acknowledged" nor stated in any way that she and Mr. Womack had any physical contact of any kind.  Further, Roehm denies as untrue the allegations that she told the friend that she knew or expected to be fired, or that she acknowledged that there were any "actions" with Mr. Womack.

34.    In answering paragraph 34, Roehm denies the allegations as untrue.  Roehm undertook travel as part and parcel of the agency review process.  This travel almost always included the other members of the agency review team.  At no time did any members of the team suggest that the travel was inappropriate for the team to be undertaking in an effort to find the best agency partner for Wal-Mart, given the importance to Wal-Mart of this objective.  Roehm had frequent one-on-one meetings

with Mr. Fleming, to whom she reported, about this exact process, particularly in the fall of 2006. Fleming never told Roehm that "she was giving inadequate attention to [her] assigned responsibilities." Instead, during this exact time, Roehm was lauded by Wal-Mart CEO Lee Scott and other senior executives for – in addition to all of her other responsibilities – her role in spearheading Wal-Mart's Shareholders Meeting. The meeting was favorably reviewed in the *New York Times*, and Roehm also led the work for the Holiday campaign that resulted in Wal-Mart winning the RACie awards show "Best in Show Award," an award which Wal-Mart never had won.[4] Roehm also was lauded publicly by Celia Swanson, SVP in the Operations group during an Officers meeting, for her role as the company's "Christmas" spokesperson, after which the entire assembly of 300 officers applauded. Precisely because Roehm was paying such close attention to her myriad responsibilities at Wal-Mart, the public relations department and Mr. Fleming asked Roehm to handle this "Christmas" spokesperson assignment for the company on such programs as the *O'Reilly Factor*, *Fox and Friends* and other local news broadcasts.

     35.    In answering paragraph 35, Roehm denies the allegations as untrue.

*D.*    *Roehm deals with all competing agencies equally to ensure that Wal-Mart would select its best possible partner at the end of the process*

     36.    In answering paragraph 36, Roehm can neither admit nor deny the allegations as asserted. In fact, Roehm carefully abided by Wal-Mart's conflict of interest and gift and gratuities policy throughout the review process, avoiding even the appearance that the review was biased or tainted in any way. It was important that all four officers of the agency review team, and the non-officer member, abide by the gift

---

[4]    The 2006 Holiday TV campaign was tested by third party research group, ARS, which showed that at least one Wal-Mart concept, led by Roehm, achieved the highest test score among the competitive set, including Wal-Mart rival Target.

and gratuity policy.  As a result, Roehm and other team members returned agency "pitch" presentations that were sent them on MP3 players, so that the players would not be construed as "gifts."  It also led to Roehm purchasing – rather than accepting as a gift – a book that was written by one of the agency members and was offered to her. Previous Wal-Mart agency partners were hired in a more informal and personal manner. For example, Wal-Mart's first agency, *Bernstein Rein*, was legendary for having been hired on a "handshake from Sam," and Roy Spence, CEO of *GSD&M*, which reportedly was introduced to Wal-Mart by his good friend and former Wal-Mart board member, Hillary Rodham Clinton.  After the introduction Wal-Mart awarded the account to *GSD&M*.  Roehm was just one-fifth of the Wal-Mart agency review team that was leading the agency review.  In fact, *AdAge* reported that during the ANA conference in Florida, Stephen Quinn stated that he was "captaining the agency review" at Wal-Mart, even though he was not a part of this five-person core team, further evidence of the ambiguous job responsibilities and management discord at the highest executive levels at Wal-Mart.

37.     In answering paragraph 37, Roehm denies the allegations as untrue. Throughout the agency review process, Roehm treated each agency equally.  During the "pitch" process, Tony Weisman was a key point of contact at *Draft/FCB* for that agency.  He frequently e-mailed, Roehm and she responded to all emails from Weisman and all other agency representatives (such as Roy Spence and Kristen Cavalla) as quickly as she could, in a fair and unbiased manner.  Roehm never provided information to any one agency that she did not or would not make available to all the rest.  Roehm continued dialogue with agencies that were aggressive in their queries, which was informative to the agency review committee, as the type and frequency of questions asked provided insight into the culture and thought processes of the agencies "pitching" the Wal-Mart account.  For example, Roehm was asked by Roy Spence of

*GSD&M* for a list of the most important and strategic thinkers in the marketing industry. Roehm provided Spence with a list, and he subsequently hired nearly all of them to act as consultants for his team for the agency review process. These friends and colleagues of Roehm were involved throughout *GSD&M's* process, and some even appeared at the final presentation to Mr. Fleming and Mr. Quinn. The *GSD&M* team asked for additional time for the media tissue session, as their allotted time fell short by one hour. The agency review committee consented, and the Wal-Mart team flew to Chicago and spent four additional hours with the *GSD&M* team. Mr. Quinn's direct report, Tony Rogers, separately flew to Austin to meet with the *GSD&M* team to provide greater insight into the brand strategy he was spearheading for Wal-Mart. Despite all of these accommodations to *GSD&M,* that agency did not win the Wal-Mart account.

38.    In answering paragraph 38, Roehm denies the allegations in the manner and form stated for the reason that they are untrue. Mr. Weisman frequently e-mailed Roehm. As is Roehm's practice, she responded to each communication within the day if at all possible. Given that Wal-Mart never had managed, in its history, an agency review process, it would not make sense to compare the amount of communication that Roehm had with each agency to "… normal customary contact with prospective suppliers." Indeed, the entire agency review process was far from ordinary at Wal-Mart, and the bidding agencies can hardly be likened to "prospective suppliers." To facilitate communications with outside agencies, the press, and the public – a function that literally was part and parcel of Roehm's job title – Wal-Mart issued to her a Palm Treo cell phone just so that she could be in continuous contact with the agencies competing for the Wal-Mart account. At all times during Roehm's employment, her manager, Mr. Fleming, was aware of the extent to which she had contact with each agency because Wal-Mart, on a weekly basis, issues two e-mail reports to its management. The reports identify, for that particular week, all e-mails sent and received by the employees directly

reporting to that manager.  On a weekly basis, Mr. Fleming knew with whom and how often Roehm was communicating with each agency, but he never commented to Roehm about the frequency of her e-mails to Mr. Weisman or to any other individual anywhere, whether at Wal-Mart or at an agency competing for Wal-Mart's account.

39.     In answering paragraph 39, Roehm denies that August 19, 2006 meeting is illustrative of anything improper.  Roehm's assistant made her travel arrangements, including the arrangements for the trip from Miami to Chicago on Friday, August 18th, to meet with the CGKD agency the following day.  Roehm recalls receiving and invitation from Mr. Weisman to meeting while she was in Chicago, and replying that she did not know if it would work.

40.     In answering paragraph 40, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  In mid-August of 2006, Roehm, Mr. Conklin, Mr. Moehring, and Mr. Womack made identical travel arrangements to attend agency review meetings in Miami and Chicago, with a Saturday morning meeting scheduled for the entire group with CGKD.  Mr. Weisman subsequently invited Roehm and the rest of the agency review team to attend the air and water show, which was scheduled for that same weekend in Chicago.  Roehm informed Mr. Conklin, Mr. Moehring and Mr. Womack of the event, but since Mr. Conklin was in the process of moving from Chicago to Bentonville, he told Roehm that he could not stay.  Since Roehm's schedule was so busy, she told Mr. Weisman if she were able to stay in Chicago on Sunday, she would let him know.  Roehm subsequently asked her assistant to see if a Saturday night stay-over would result in any cost savings on her return flight to Bentonville.

41.     In answering paragraph 41, Roehm states that she recalls Mr. Weisman sending her a message suggesting that he could take her out on their sailboat to view the show, but Roehm declined the invitation.

42.     In answering paragraph 42, Roehm recalls receiving a follow-up message from Mr. Weisman that she view the show from his sailboat, but Roehm denies the remaining allegations in the manner and form stated for the reason that they are either inaccurate, misleading, or untrue.

43.     In answering paragraph 43, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Howard Draft and Mr. Weisman invited the Wal-Mart agency review team to dinner on August 19, 2006 to introduce the team to Draft/FCB's creative director, Jonathan Harries.  Mr. Conklin and Mr. Moehring had previous plans and were unable to attend.   Roehm recalls declining Mr. Weisman's request that he pay for their dinner.  Mr. Womack and Roehm met with Mr. Draft, Mr. Harries and Mr. Weisman.  All three Draft/FCB representatives already had been at the restaurant for a long time before Roehm and Mr. Womack arrived, because there were a number of empty drinks and bottles of wine at the table.   Roehm reiterated to Weisman that Draft/FCB was not allowed to pay for Wal-Mart employee meals, having explained on several occasions to Mr. Weisman and other members of other agencies that this was Wal-Mart policy.  The dinner consisted of small, White Castle-sized burgers that were passed around the table.   Roehm's portion of the meal was minimal, and based on Wal-Mart policy, Draft/FCB was supposed to bill Wal-Mart back for Roehm's portion of the meal, with Roehm then being personally responsible to pay Wal-Mart back for the cost of any portion of the meal in excess of her $25 Wal-Mart *per diem*.[5]  Roehm therefore expected that Draft/FCB would bill her back for her charges,

---

5       As was customary, Roehm turned over all of her travel receipts to her administrative assistant, who was aware of Roehm's travel purposes and itinerary and would complete Roehm's expense

which she would then reconcile with Wal-Mart.  Roehm denies that she violated Wal-Mart's gifts and gratuities policies.

44.    In answering paragraph 44, Roehm denies the allegations as untrue.  The dinner meeting served the express business purpose of introducing the Wal-Mart agency review team to the worldwide creative director of Draft/FCB, who, prior to this meeting, had never met Wal-Mart's agency review team members.  The discussions during and after dinner revolved around insights that the Draft/FCB team had uncovered about Wal-Mart shoppers.  It did not involve future employment opportunities for either Mr. Womack or Roehm.  Roehm denies that either she or Mr. Womack misused their company positions or company-paid travel for personal reasons.

45.    In answering paragraph 45, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Further, Roehm denies as untrue Wal-Mart's conclusory assertion that she was "explor[ing]" the possibility of leaving Wal-Mart to partner with Mr. Weisman and Draft/FCB.

46.    In answering paragraph 46, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Wal-Mart has quoted Mr. Womack's e-mail out of context and asserted conclusions that are neither warranted nor accurate.

47.    In answering paragraph 47, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Wal-Mart has quoted Mr.

---

report.  When Roehm recruited prospective employees to come to Wal-Mart from outside the Arkansas area, Roehm would take these individuals out to dinner and pay from her own pocket any amounts in excess of the $25 per diem, as well as all charges for wine or other alcoholic beverages.  The same was true when she went out with vendors; Roehm would pay for her own drinks, none of which were reimbursable by Wal-Mart, even if business was being discussed.

Womack's e-mail out of context and asserted conclusions that are neither warranted nor accurate.

48.    In answering paragraph 48, Roehm states that the entire closing paragraph of Mr. Womack's August 20, 2006 e-mail message (marked as Exhibit 8 during Plaintiff's May 11, 2007 deposition) reads:  "So *I* could go on, and *I* will at some point in time, but for now, this is the majority of the big, important questions.  You can mull on them or answer them, but know that we'll certainly be talking about them a lot between now and the 20th."  (Emphasis added).

49.    In answering paragraph 49, Roehm denies as untrue Wal-Mart's conclusory allegation that "[t]he conversation continued."  On October 6, 2006, Roehm did travel to Chicago, where she received the University of Chicago's Graduate School of Business Distinguished Alumni Award.  She traveled to Chicago on personal time and at personal expense.  During that trip, Mr. Weisman, Mr. Draft, Mr. Womack, and Roehm met for lunch.  Mr. Womack informed Roehm that he had met with Mr. Draft earlier and sought and received personal advice from Mr. Draft on marriage issues, in light of Mr. Draft's personal experience.  To Roehm's knowledge, there was no discussion between Mr. Draft and Mr. Womack regarding the possibility of Mr. Womack and/or Roehm joining Draft/FCB as employees.  Roehm denies that Mr. Draft ever told Roehm or Mr. Womack that he had "determined that he could not make an employment offer to Womack," and further denies that there was any basis upon which to "inform her superiors at Wal-Mart that Womack was soliciting employment from one of the agencies participating in the RFP."

E.    *Roehm did not accept gifts and gratuities*

50.    In answering paragraph 50, Roehm denies the allegations as untrue. While Roehm received Effen vodka from Mr. Draft, consistent with Wal-Mart policy, she reimbursed Mr. Draft at the retail price (of $21 per bottle) for the bottles of vodka that she received.

51.    In answering paragraph 51, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  The Wal-Mart holiday meeting was held in Houston in September of 2006.  This event offered all participating agencies a chance to tour Wal-Mart's store set-up and to see its merchandise.  Mr. Weisman re-arranged a previously scheduled trip to New York to attend with the other agencies competing for the Wal-Mart account.  After the tour, Roehm received from Mr. Weisman an e-mail with a dinner invitation.  Roehm again expected that, as she had instructed, Mr. Weisman was billing Wal-Mart back for her share of the dinner expenses.

52.    In answering paragraph 52, Roehm denies the allegations in the manner and form stated for the reason that they are untrue and for the reason that the conclusions stated or suggested are neither warranted nor accurate.  Roehm denies that Draft/FCB was treated any differently than any other competing agency; in fact, Roehm hosted representatives of the Martin Agency in early September at barbeque her home when their plane was delayed due to a hurricane on the east coast.  All of Roehm's e-mails, including any of Roehm's e-mails sent to either the Martin Agency or Draft/FCB, were sent to her supervisor on a weekly basis, so Mr. Fleming continuously was aware of all contact that Roehm had with all agencies.  At the final vote for the winning agency, of the ten Wal-Mart executives that would vote to decide the winner, Roehm voted last, and her vote had no impact on the outcome because the vote already was 8-1 in favor of Draft/FCB by the time it was Roehm's turn.  After the vote, Mr. Fleming commented to Roehm that he was surprised that she had voted for draft

FCB, since he thought that Roehm believed Ogilvy was the stronger agency.  Mr. Fleming also told Roehm that "GSD&M did not stand a chance" because a change was needed at Wal-Mart.  He went on to say that Ogilvy was strong, but its creative ideas were too "Target-like," and Ogilvy had a decidedly "New York culture," which Mr. Fleming did not like for Wal-Mart.  He especially was impressed with Draft/FCB's in-store capabilities, and he told Roehm that he felt that Draft/FCB's analytic capabilities would provide insight and direction that was currently lacking at Wal-Mart.  It was not surprising that Mr. Fleming favored Draft/FCB, since he consistently told Roehm that Wal-Mart's in-store environment was more important than media and advertising, and that Draft/FCB appealed to him.  Mr. Scott recently affirmed those same ideas that he had expressed to Roehm in his recent comments to *BusinessWeek*.[6]

53.    In answering paragraph 53, Roehm denies the allegations in the manner and form stated for the reason that they are untrue and for the reason that the conclusions stated or suggested are neither warranted nor accurate.  Roehm declined dinner with Mr. Weisman on September 18, 2006.  Roehm e-mailed Mr. Weisman directly, thanking him for the case of vodka, for which she later reimbursed Draft/FCB directly.

54.    In answering paragraph 54, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Roehm played a round of golf with

---

[6]    Both Ogilvy and The Martin Agency representatives commented to Roehm about the professional handling of the review, even after they were told that Draft/FCB had won.  When Roehm spoke to Shelley Lazarus of Ogilvy to inform her of Wal-Mart's decision, Ms. Lazarus told Roehm that her staff had enjoyed working with the Wal-Mart agency review team, and that they felt that the review was thorough and exhaustive.  John Adams of the Martin Agency conveyed similar remarks.  Furthermore, after the review was completed, the *New York Post* inaccurately reported that Roehm had taken the participating agencies out onto the streets, after an Eagles concert that they had all been invited to, to tell them that they had lost the review.  Mr. Adams called Roehm the next day to alert her of erroneous news report and to tell her of his anger at this portrayal of the review.  He then wrote a response to the *New York Post*, explaining that its story was not accurate and that Roehm and the Wal-Mart team had completed a thorough and professional review.

her personal friend, Mark Rockefeller, who was neither associated with any advertising agency competing for the Wal-Mart account, nor is he a vendor or prospective vendor of Wal-Mart.

F.    *Roehm comments on Draft/FCB's qualifications at the AdForum conference on September 20, 2006*

55.    In answering paragraph 55, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  On September 20, 2006, Draft/FCB hosted an "AdForum" conference, and Roehm was asked to make some spontaneous remarks regarding the reason for Draft/FCB's inclusion as one of the final four agencies being considered by Wal-Mart in its agency review.  Roehm denies that she "lavishly" praised Draft/FCB.  Instead, Roehm made her remarks in an unbiased fashion, enumerating the qualities that Wal-Mart sought for its agency partner and identifying those which Draft/FCB possessed.  She emphasized that there were other reasons that other agencies in the review also were in the finals, and that no decision had been made.  Catherine Bension of SRI, Wal-Mart's third-party independent agency review consultant, was aware of this conference and knew of Roehm's remarks, both before and after the event itself.  She did not object to Roehm's participation and did not tell Roehm that she thought her presence or comments indicated a bias.

56.    In answering paragraph 56, Roehm admits that she attended a Draft/FCB event that was held immediately after the conference, at Nobu 57, and that most of the guests were consultants who coordinate agency reviews.  Beyond that, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  While Roehm very briefly sat on Weisman's lap for a group photo, the allegation that she spent any extended amount of time sitting in his lap or that she was eating food off of his plate is untrue.

57.    In answering paragraph 57, Roehm denies the allegations as untrue.  In fact, many members in attendance spoke to Roehm at the restaurant and told her that hearing from a client in the midst of a review helped them to understand what made an agency qualified to be a finalist and offered a useful perspective to all in attendance. Two other consultants specifically told Roehm that they thought she had done a terrific job and was completely unbiased in her comments.  Until Wal-Mart filed its counterclaim, no one at Wal-Mart had ever told Roehm that her appearance at the event "cast a shadow over Wal-Mart's review."

58.    In answering paragraph 58, Roehm denies the allegations in the manner and form stated for the reason that they are untrue and for the reason that the conclusions stated or suggested are neither warranted nor accurate.  In fact, Mr. Weisman asked Roehm if she would make an impromptu speech at the AdForum conference in New York on behalf of Draft/FCB, which formally was revealing its model to the consultants.  Roehm agreed to speak only on the benefits, as she saw them, for a direct marketing agency to join a traditional creative agency.  Roehm agreed to speak on the merits of the model and discuss her experience with it to date.  Roehm never said that this approach was the best or only acceptable model, nor did she suggest that Draft/FCB had won or would win the Wal-Mart account.

59.    In answering paragraph 59, Roehm denies the allegations as untrue. Roehm's relationship with Draft/FCB was a business relationship, not a social relationship.  Due diligence in the choice of an agency partner requires that the people who will be the primary points of contact for Wal-Mart and its agency partner evaluate their working relationships, because it is both the client-agency relationship and the agency's capabilities that determine a successful partnership.  It is far different than the "norms" in Wal-Mart's culture when negotiating, for example, the price of laundry

detergent between Wal-Mart and its potential suppliers. The "purchase" of an agency partner is an acquisition of talent and "chemistry" between the agency and Wal-Mart (which is why, of course, the "Chemistry Checks" were part of the Agency Selection and Review Committee evaluation process). Interacting with people from all potential agencies was necessary to truly evaluate the potential agencies' abilities to be Wal-Mart's new advertising partner; this type of evaluative process *is* the "norm" in the advertising industry and was a cornerstone of the process recommended by SRI, which Wal-Mart specifically hired as an external consultant to help to guide the agency review process. Moreover, Wal-Mart's claims that Roehm violated Wal-Mart's Statement of Ethics regarding social relationships with suppliers is not supported by past practices at Wal-Mart, since Wal-Mart's executives do not abide by Wal-Mart's Statement of Ethics regarding social relationships with suppliers. Mr. Scott, for example, maintains a relationship with Mr. Jacobs that is beyond a business relationship, using private airplanes provided by Mr. Jacobs to travel to Mr. Scott's personal vacation residences, even though one of Mr. Jacobs' businesses, *Jacobs Trading Company* (JTC), is a Wal-Mart vendor, purchasing from Wal-Mart its unsold merchandise. Roehm also denies as untrue that her appearance at the AdForum event interfered with Wal-Mart's interests in conducting a fair and impartial agency review. The ten-member team that Wal-Mart entrusted with selecting the winning agency included Mr. Fleming, Mr. Quinn, Mr. Bratspies, Mr. Rogers, Mr. Atencio, Mr. Vazquez, Mr. Broder, Mr. Conklin, Mr. Womack and Roehm, none of whom were biased in any way by Roehm's attendance at the AdForum. Nine of the ten members voted to select Draft/FCB as the winning agency; Roehm voted last, long after the outcome already had been decided by the nine male members of the team.

G.     *Roehm did not provide Draft/FCB with an advantage in the Wal-Mart agency review process*

60.     In answering paragraph 60, Roehm denies the allegations as untrue. Further, Roehm provided information and advice to all agencies involved in the review, as is customary and required in an agency review process.  Roehm did not provide to Mr. Weisman or to any other agency in the review process information as to the likelihood of success for other agencies.  Roehm offered guidance to all agencies trying address issues that Wal-Mart had with its current advertising circumstances and Wal-Mart's culture, and she offered help the agencies to understand what Wal-Mart hoped to achieve with a new partner.  For example, on September 8, 2006, Roehm and Mr. Weisman discussed issues and concerns that Mr. Quinn was hoping to address with a new advertising partner, and they also discussed Roehm's own views on agency compensation the need for a very low margin, with an upside bonus based upon achieving Wal-Mart's goals and objectives.[7]  Roehm shared this point of view with every agency involved in the review process, and she also discussed it at length with the committee and with Catherine Bension.  These comments and suggestions were given to every agency participating in the review.  Indeed, part of the committee's job was to provide as much information as possible to each agency, with the express objective of ensuring that every agency would be as prepared as possible for the final presentations, bringing to Wal-Mart its best ideas to address the concerns of Wal-Mart's highest-level executives.  That is why these meetings were customary, necessary, and even recommended by SRI.  The meeting of September 28, 2006 was a pre-planned part of the review process, and it was attended by Mr. Conklin, Mr. Moehring, Mr. Womack,

---

[7]     After Wal-Mart's ten-member team awarded the advertising account to Draft/FCB, Roehm, Ms. Bension, and Jim Murphy negotiated a margin of 6%, a reduction in overall headcount from that which was originally presented, and an upside bonus to be paid out in accordance with Wal-Mart's achievement of its profit and sales goals.  That rate was much lower than the 20% margin rate Wal-Mart now pays to the Martin Agency, the agency it subsequently selected to replace Draft/FCB.

and Roehm.  Roehm never told Mr. Weisman or any other agency representative his or her agency had "won the pitch" until after the final vote had been taken.

61.    In answering paragraph 61, Roehm can neither admit nor deny the allegations as asserted, being without sufficient knowledge or information to form a belief as to the truth of the matter asserted.  Wal-Mart quotes from an alleged e-mail message Roehm has never seen.  Roehm denies that she provided any special information to Draft/FCB.

62.    In answering paragraph 62, Roehm denies that she improperly disclosed any sensitive or proprietary assessments of Wal-Mart's performance and marketing strategies.  Wal-Mart's September sales forecast results that Roehm forwarded to Mr. Weisman were part and parcel of the non-disclosure agreement that Draft/FCB signed as a participant in the agency review, and that is why Draft/FCB – and all other agencies participating in the review – was given that type of data upon request.  Indeed, Mr. Bratspies, Mr. Rogers, Mr. Atencio and Mr. Moehring gave every agency participating in the process exhaustive, confidential information regarding Wal-Mart's customer profile and Wal-Mart's strategies going forward, including insights on Wal-Mart's new branding and logo plans.  Roehm denies the remaining conclusory allegations for the reason that they are untrue.

63.    In answering paragraph 63, Roehm denies that she ever improperly shared or disclosed confidential communications with Draft/FCB in an effort to advance her own interests over Wal-Mart's interests.  In late November, Wal-Mart executives became very concerned about an advertisement that Draft/FCB had created to congratulate its own team members for an unrelated award they had won.  The advertisement featured a lion mounting its mate, with a single caption line: "It's good to be on top."  This advertisement ran shortly after the review process had been completed

and had nothing to do with Wal-Mart, but some Wal-Mart executives became extraordinarily uncomfortable over the "kind of agency that would run an ad like that." Roehm told Mr. Draft about the concerns of the Wal-Mart executives and reminded Mr. Draft that any work done by an agency working for Wal-Mart ultimately would reflect on Wal-Mart, and therefore, if Draft/FCB were awarded Wal-Mart's account, all Draft/FCB work – regardless of the client for which the work was created – must be within the guidelines of Wal-Mart's taste.  Roehm then sent an e-mail to John Menzer, Eduardo Castro-Wright, Chief Executive Officer of Wal-Mart Stores USA, and John Fleming, explaining that she spoken with Mr. Draft and that he had acknowledged and agreed to that responsibility.

H.     *Wal-Mart creates a pretext for getting rid of Roehm so that it can avoid difficult questions about its fundamental unwillingness to change its corporate culture and modernize its marketing strategies*

        64.    In answering paragraph 64, Roehm denies the allegations in the first sentence of the paragraph in the manner and form stated for the reason that they are untrue.  Draft/FCB was not selected until nine of the ten members on the agency review team voted to select Draft/FCB as the winning agency; Roehm voted last, long after the outcome already had been decided by the nine male members of the team.  With respect to the remainder of the paragraph, Roehm neither admits nor denies the allegations, being without knowledge or information sufficient to form a belief as to the truth of all the matters asserted.  Wal-Mart decided to terminate Roehm because its executives had become increasingly uncomfortable with Roehm's new ideas and cultural change, and they were looking for some way to revert back to their old, price-based approach to sales, without embarrassing themselves by reversing the high-profile decision they had made to hire her just nine months earlier.  Thus, they decided to try to

"build a case against her," as David Porter, Wal-Mart's Vice President of Merchandising for Entertainment and Electronics, privately told a Wal-Mart vendor.

65.    In answering paragraph 65, Roehm neither admits nor denies Wal-Mart's assertion that it conducted a "thorough review of the agency selection process and related matters," being without knowledge or information sufficient to form a belief as to the truth of that assertion.  As to the remainder of the paragraph, Roehm denies the allegations in the manner and form stated for the reason that they are untrue and for the reason that the conclusions stated or suggested are neither warranted nor accurate. On December 2, 2006, Kenneth H. Senser, a former top official at the C.I.A. and F.B.I. who runs Wal-Mart's security department, Thomas A. Mars, Wal-Mart's general counsel, and Susan Chambers interrogated Roehm after Wal-Mart sent a corporate jet to Chicago to bring Roehm and five other Wal-Mart employees back to Arkansas.  After arriving in Bentonville at around 6:00 p.m. that night, Roehm was sent to meet with Mr. Castro-Wright and Mr. Fleming.  Mr. Fleming and Mr. Castro-Wright asked Roehm about the agency review process and her thoughts on Draft/FCB retaining the Wal-Mart account, in light of Draft/FCB's recent unrelated advertisement that had offended some Wal-Mart executives.  Neither Mr. Fleming nor Mr. Castro-Wright commented on Roehm's job performance or any alleged improprieties.  At the end of the meeting, Roehm left Mr. Castro-Wright's office, and Susan Chambers met Roehm and escorted Roehm to Mr. Senser's office, where she was interrogated about meetings and communications with Draft/FCB, vodka, meals, watches, and her relationship with Mr. Womack.  Roehm's payment for the vodka was an effort to comply with Wal-Mart policy, and was not – as alleged – an attempt to conceal that she had received an improper gratuity.[8]

---

8    Indeed, how would Roehm have known of the need to "conceal" anything from Wal-Mart if she did not know she was being investigated?

66.    In answering paragraph 66, Roehm denies the allegations in the manner and form stated for the reason that they are untrue.  Wal-Mart did terminate Roehm and Mr. Womack on December 4, 2006.  However, Wal-Mart refused to explain its basis for terminating Roehm when she requested an explanation.  Wal-Mart's current explanation of the basis of its decision to terminate Roehm – articulated for the first time in the context of Wal-Mart's Counterclaim – is a pretext for its true reason, or basis, for terminating Roehm.  The true reason, or basis, that Wal-Mart terminated Roehm was that it was looking for some way to revert back to its old, price-based approach to sales, without embarrassing itself by reversing the high-profile decision it had made to hire Roehm just nine months earlier.  Further, Wal-Mart dropped Draft/FCB because it too was advocating a progressive, marketing-based approach to appeal more to upscale shoppers, but Wal-Mart executives could not stomach that change to its tired brand.[9]

67.    In answering paragraph 67, Roehm denies the allegations as untrue.  Any new costs that Wal-Mart incurred in the "re-evaluation" process were due to its own inconsistent internal decision-making, not because of anything Roehm did.


I.    *Roehm tells about what happened at Wal-Mart, revealing the internal strife and unwillingness to change that Wal-Mart tried to conceal from the public*

68.    In answering paragraph 68, Roehm denies the allegations as untrue. Indeed, despite Roehm's post-termination efforts to work with Wal-Mart to minimize media sensationalism and keep private her attempts to resolve this matter, Wal-Mart immediately engaged in a deliberate and calculated campaign of "leaks" to disparage Roehm and deflect criticism that Wal-Mart was afraid it would endure by reversing the

---

9    All work that submitted by the agencies participating in the agency review was evaluated by independent, third-party marketing research firms.  Based upon that advertisement research, Draft/FCB's work delivered the best results, as measured against the objectives that Mr. Quinn's marketing strategy team created and Wal-Mart provided to the competing agencies.

high-profile decision it had made to change its tired corporate culture and hire Roehm just nine months earlier.

69.    In answering paragraph 69, Roehm admits that she made the statement that she "… was hired to do a job as a change agent," because that is, in fact, what Mr. Fleming told her when Wal-Mart hired her.  Moreover, Mr. Fleming specifically told Roehm that her primary responsibilities were the development of the Marketing Communications organization, the agency review, and key advertising campaigns. Roehm accomplished every one of those objectives.  After Wal-Mart hired Draft/FCB, Roehm had completed every task that Mr. Fleming had given to her.  Roehm also admits that she made the statement that "… my primary function here is done."  Roehm denies that she was fired for egregious misconduct.  (See response to paragraph 66, above.)  Roehm admits that she told representatives of the media that she engaged in no wrongdoing.  Roehm also admits that the Wall Street Journal reported the quoted statements.

70.    In answering paragraph 70, Roehm admits that Wal-Mart stated to the media that it "had irrefutable evidence of an inappropriate relationship between Roehm and Womack."  Roehm denies the remaining allegations in the manner and form stated for the reason that they are untrue and for the reason that the conclusions stated or suggested (both Wal-Mart's and the writer's conclusions) are neither warranted nor accurate.

71.    In answering paragraph 71, Roehm admits that she made the statement that her termination was the result of a lack of support by Wal-Mart's senior executives, because that is, in fact, what occurred.  During her employment, Roehm made multiple attempts to achieve a positive working relationship with Mr. Quinn and his marketing team.  Roehm repeatedly met with Mr. Fleming to discuss her overtures, which Mr.

Quinn routinely rejected. Mr. Quinn never invited Roehm or her team members to strategy meetings, although Roehm wrote a number of e-mails and made many phone calls requesting that her team be included in the strategy process. Rather than addressing what was becoming a serious problem, Mr. Fleming simply continued to advise Roehm to "take the high road." In an effort to do so, Roehm wrote an e-mail to Mr. Quinn in October of 2006, trying to reinforce any sign of positive engagements she had with Mr. Quinn. Unfortunately, these brief reprises always were short-lived, as Mr. Quinn consistently tried to exclude undermine Roehm's organization and exclude its members from the decision-making process. Roehm denies that her assertions that her termination was the result of a lack of support by Wal-Mart's senior executives are belied by Roehm's own statements in the quoted e-mail or during her employment.

### Count One:  Breach of Fiduciary Duty – Duty of Care

72.      In answering paragraph 72, Roehm incorporates the allegations of paragraphs 1 through 71 of this Reply to Defendant's Counterclaim, as if fully set forth herein.

73.      In answering paragraph 73, Roehm admits that as an officer and fiduciary of Wal-Mart, she owed a duty of care that required that she discharge her duties and contractual agreements in good faith and with the care than ordinarily prudent person in like position would exercise under similar circumstances, and in the best interests of Wal-Mart.

74.      In answering paragraph 74, Roehm denies that she failed to avoid conflicts of interest, maintained inappropriate relationships, inappropriately excepted gifts and gratuities, used her position to further her own career interests or romantic engagements, maintained an inappropriate relationship with a subordinate, or lied about

her activities when questioned by Wal-Mart officials.  Roehm did not violate her
agreement, various company policies, or breach her fiduciary duties to Wal-Mart.

75.    In answering paragraph 75, Roehm denies that she mismanaged and
misappropriated Wal-Mart assets, made improper contacts, inappropriately accepted
gifts and gratuities, or jeopardized Wal-Mart advertising agency review process.  Roehm
did not violate her duty of care in a manner that required the agency review process to
be re-opened or cause Wal-Mart to incur substantial and otherwise unnecessary costs
and expenses.

76.    In answering paragraph 76, Roehm did not breach her fiduciary duty to
Wal-Mart, and Wal-Mart did not sustain any damages as a result of anything that
Roehm did or failed to do.

### Count Two:  Breach of Fiduciary Duty – Duty of Loyalty

77.    In answering paragraph 77, Roehm incorporates the allegations of
paragraphs 1 through 76 of this Reply to Defendant's Counterclaim, as if fully set forth
herein.

78.    In answering paragraph 78, Roehm admits that as an officer and fiduciary
of Wal-Mart, she owed a duty of loyalty required that she act on behalf of Wal-Mart and
refrain from self-dealing, usurpation of Wal-Mart opportunities, and any other acts that
would permit her to receive improper personal benefits at the expense of her employer,
or to former employer by pursuing her own personal self-interest.

79.    In answering paragraph 79, Roehm denies that she breached her duty of
loyalty to Wal-Mart through any actions or inactions whatsoever.  Roehm denies that
during the agency review process, she engaged in a pattern and practice of behavior

intended to further her own interests, notoriety, and romantic pursuits at the expense of Wal-Mart and the review process for which she was responsible. Roehm denies that her actions caused Wal-Mart's highly-public rescission of the selection decision produced by the agency review process or the sustained negative attention Wal-Mart's marketing department received. Wal-Mart and its executives brought any sustained negative attention entirely on themselves.

80.    In answering paragraph 80, during the agency review process, Roehm was in frequent communication with all competing agencies, including Draft/FCB, but her topics of conversation never were disloyal to Wal-Mart or involved her own self-interest.

81.    In answering paragraph 81, Roehm did not engage in any improper acts and did not create the appearance of favoritism towards Draft/FCB at the expense of Wal-Mart. Roehm did not violate her duty of loyalty to Wal-Mart.

82.    In answering paragraph 82, Roehm did not breach her fiduciary duty to Wal-Mart, and Wal-Mart did not sustain any damages as a result of any actions or inactions by Roehm, including additional costs, lost opportunities, economic losses, monetary damages, harm to Wal-Mart's public image, attorney fees, or other consequential losses.

**WHEREFORE**, Plaintiff prays that this Honorable Court enter a Judgment in her favor, and against Defendant, for: (1) money damages in an amount consistent with the evidence to compensate Plaintiff for her economic and non-economic damages, (2) punitive damages, (3) appropriate injunctive/equitable relief, and (4) an award of costs of this litigation, including reasonable attorney fees, costs and interest.

Respectfully submitted,


s:\Sam G. Morgan, (P-36694)
SOMMERS SCHWARTZ, P.C.
**Attorneys for Plaintiff**
2000 Town Center, Suite 900
Southfield, Michigan  48075-1100
(248) 355-0300
smorgan@sommerspc.com


s:\B. Andrew Rifkin,  (P-46147)
THE LAW FIRM OF JOHN F. SCHAEFER
**Attorneys for Plaintiff**
380 North Old Woodward, Suite 320
Birmingham, Michigan  48009
(248) 642-6665
bar@lfjfs.com

Dated:  May 24, 2007.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 24, 2007, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

John F. Schaefer (P-19948) at bar@lfjfs.com
Sam G. Morgan, (P-36694) at smorgan@sommerspc.com
B. Andrew Rifkin (P-46147) at bar@lfjfs.com
Eugene Scalia at escalia@gibsondunn.com
Debra M. McCulloch (P-31995) at dmcculloch@dykema.com

and I hereby certify that I have mailed by United States Postal Service the papers to the following non-ECF participants:  N/A

<u>s:\B. Andrew Rifkin,  (P-46147)</u>
THE LAW FIRM OF JOHN F. SCHAEFER
**Attorneys for Plaintiff**
380 North Old Woodward, Suite 320
Birmingham, Michigan  48009
(248) 642-6665
bar@lfjfs.com