Case 2:07-cv-10168-LPZ-RSW    Document 22-3    Filed 05/25/2007    Page 1 of

Dockets.Justia.com

```
00001
 1              UNITED STATES DISTRICT COURT
          IN THE EASTERN DISTRICT OF MICHIGAN
 2                  SOUTHERN DIVISION
   JULIE ANN ROEHM,                    )
 3                                     )
                    Plaintiff,         )
 4                                     )
   vs.                                 ) CASE NO. 2:07-CV-10168
 5                                     )
   WAL-MART STORES, INC.,              )
 6                                     )
                    Defendant.         )
 7                                     )
             DEPOSITION OF JULIE ANN ROEHM
 8        Taken at 5414 Pinnacle Point Drive, Suite
   500, Rogers, Arkansas, on May 11, 2007, at 12:15 p.m.
 9                  APPEARANCES
   MR. SAM G. MORGAN              FOR THE PLAINTIFF
10 Sommers Schwartz Law Offices
   2000 Town Center, Suite 900
11 Southfield, Michigan  48075-1100
   (248) 746-4008
12 (248) 936-2148 Fax
13    -AND-
14 MR. B. ANDREW RIFKIN
15 The Law Firm of John F. Schaefer
16 380 N. Old Woodward Avenue, Ste. 320
17 Birmingham, Michigan  48009
18 (248) 642-6655
19 (248) 642-7878 Fax
20 MR. KARL G. NELSON              FOR THE DEFENDANT
21 Gibson, Dunn & Crutcher LLP
22 2100 McKinney Avenue, Suite 1100
23 Dallas, Texas  75201-6911
24 (214) 698-3203
25 (214) 571-2954 Fax
```

```
00002
 1                  I N D E X
   TESTIMONY BY JULIE ANN ROEHM                Page
 2      Examination by Mr. Nelson------------------------3
        Examination by Mr. Morgan-----------------------55
 3      Reexamination by Mr. Nelson---------------------60

 4

 5              E X H I B I T S

 6 Deposition
   Exhibit                                    Marked
 7 1 (Complaint)----------------------------------------4
     (Chicago Sun Times Article, December 6, 2006)-------8
 8 3 (Brandweek.com Article)---------------------------10
     (E-mails dated March 6, 2006)----------------------13
 9 5 (E-mails dated March 7 and 8, 2006)----------------15
10   (E-mails dated April 3 and 4, 2006)----------------17
11 7 (E-mails dated June 2, 2006)----------------------19
```

12   (E-mails dated August 20, 2006)--------------------22
13   9 (Northwest Airlines Flight Information)------------35
14   0 (Letter dated January 10, 2006)--------------------46
15   11 (Arkansas Secretary of State Printout)------------53
16
17
18
19
20
21
22
23
24
25
00003
 1           JULIE ANN ROEHM, having been called upon to
 2   testify in the form of a deposition, and having been duly
 3   sworn, testified as follows, to wit:
 4                           EXAMINATION
 5   BY MR. NELSON:
 6   Q.    Ms. Roehm, I'm Karl Nelson.  I introduced myself
 7   earlier.  And I'm here representing Wal-Mart Stores.  I
 8   assume you know that.
 9           Let's just get a couple of preliminary things out of
10   the way.  For the court reporter's benefit, would you give
11   her your full legal name?
12   A.    Julie Ann Roehm.
13   Q.    And I guess maybe just so that we can all be on the
14   same page, have you testified before either at a
15   deposition or at a trial?
16   A.    Yes.  In a deposition.
17   Q.    Okay.  Once or multiple times?
18   A.    Once.
19   Q.    All right.  I'm sure that your attorneys have
20   probably talked with you about the process this time and
21   probably that time, as well.  So I won't spend a lot of
22   time on it, but if you have questions, stop me.
23           You know, one thing that I'll ask you to do, and I'm
24   sure they've mentioned to you, is to give verbal answers
25   to my questions --
00004
 1   A.    Yes.
 2   Q.    -- so that Ms. Alexander can actually take them
 3   down.
 4           As I go through my questioning, my intent is not to
 5   be tricky or anything, so if there's a question that you
 6   don't understand, please ask me to either clarify or
 7   restate it.
 8   A.    Okay.
 9   Q.    And I don't expect that we'll be in this very long,
10   but if at any point you need a break, just let me know.
11   It's not an endurance test.
12   A.    Okay.
13   Q.    You know, I will ask you if I've got a question
14   pending , to just finish up the question before we break;
15   but otherwise, we can take a break at any time.
16   A.    Okay.

17  Q.     Let me start by asking you some questions about
18  the -- the complaint that was filed in your case.  And I
19  guess we can go ahead and mark this as an exhibit.  I'm
20  not sure that it's going to be terribly significant.
21          (Wherein, Deposition Exhibit 1 was marked.)
22  Q.     (Mr. Nelson continued.)  I assume you've seen this
23  document.
24  A.     Yes.
25  Q.     Did you review it before it was filed?
00005
1  A.     Yes, I think so.
2  Q.     Okay.
3  A.     I think so.  The dates are -- but I believe so, yes.
4  Q.     All right.  I assume that whenever it was that you
5  reviewed it, you were comfortable that everything in it
6  was accurate and true.
7  A.     Yes.
8  Q.     Okay.  I'll represent to you, and you can see on the
9  front cover, there's a stamp that shows -- is dated
10  December 15th.  And I'll represent to you that, to my
11  understanding, that's the date that the complaint was
12  actually filed with the court.  Does that sound consistent
13  with your recollection?
14  A.     Yes, it...
15             MR. MORGAN:  You have to answer.
16  A.     Yes.  Yes.  It -- To the best of my recollection,
17  yeah.
18  Q.     (Mr. Nelson continued.)  Okay.  I want to ask you a
19  few questions that have to do with, you know, the decision
20  to file the lawsuit, but I want to be clear that I'm not
21  asking you about the substance of any discussions you may
22  have had with any of your lawyers.  I just want to know
23  sort of what was in your mind leading up to the filing of
24  the complaint.
25  A.     Okay.
00006
1  Q.     When did you first begin to contemplate the idea of
2  possibly filing a lawsuit?
3  A.     After I was terminated from the position, so
4  sometime after December 6th.
5  Q.     Okay.
6  A.     '06.
7  Q.     And presumably before December 15th.
8  A.     And before December 15th.
9  Q.     So within that week or so.
10  A.     Uh-huh.  Yes.
11  Q.     All right.  Again, without getting into any
12  substance, when did you first contact a lawyer about the
13  lawsuit or about the possibility of a lawsuit?
14  A.     The -- December 6th, the day I was terminated, I
15  contacted John Schaefer --
16  Q.     Okay.
17  A.     -- to let him know that I had been terminated.
18             MR. MORGAN:  Let --
19  Q.     (Mr. Nelson continued.)  You don't have to tell me.
20             MR. MORGAN:  You don't have -- and I don't
21  want you to describe anything that you talked about.

```
22  A.      Oh.  No.  I just called him.  I'm not telling you
23  any more.
24  Q.      (Mr. Nelson continued.)  That's fine.  And that --
25  and I'm not asking for any more.
00007
 1  A.      Okay.
 2  Q.      Did you have some prior dealings with Mr. Schaefer,
 3  or how did --
 4              MR. NELSON:  Objection, relevance.
 5  A.      Do I still answer?
 6  Q.      (Mr. Nelson continued.)  Yes.
 7  A.      Yes?
 8              MR. MORGAN:  Yes.
 9  A.      Yes.  Yes, I had called him prior.
10  Q.      (Mr. Nelson continued.)  Okay.  Prior to your
11  termination.
12  A.      Yes.
13  Q.      Okay.  Did you have contact with any attorneys here
14  in Arkansas?
15  A.      No, not besides Mr. Mars.
16  Q.      Okay.  All right.  That's a fair answer.
17          In terms of possibly representing you or bringing a
18  lawsuit, you had no contact with anybody here.
19  A.      That's correct.
20              MR. MORGAN:  I'm going to object to the form
21  of the question, calls for attorney-client privileged
22  communication.
23  Q.      (Mr. Nelson continued.)  Well, with regard to
24  anything on your behalf, you had no contact with an
25  attorney here.
00008
 1  A.      That's correct.
 2  Q.      Okay.  Why did you not consult with any Arkansas
 3  lawyers?
 4  A.      I was referred to Mr. Schaefer by a colleague of
 5  mine previously --
 6  Q.      Okay.
 7  A.      -- and felt more comfortable going with somebody who
 8  had had prior experience.
 9  Q.      And when you say previously, again, we're talking
10  about before you were actually terminated.
11  A.      I had conversations with a colleague that I had
12  known for many years who had experience with
13  Mr. Schaefer's office on legal matters pertaining to
14  business.
15  Q.      Okay.  I'm just trying to get the time frame of that
16  discussion with the colleague.
17  A.      Oh.  That had been -- I had those conversations with
18  that colleague probably before I was even employed at
19  Wal-Mart.
20  Q.      Okay.  All right.  Let me pull out a couple of other
21  documents real quickly.
22          (Wherein, Deposition Exhibit 2 was marked.)
23  Q.      (Mr. Nelson continued.)  I want to ask you just a
24  few quick questions about some statements that have been
25  attributed to you in the press here.  Take a moment to go
00009
```

```
 1  ahead and review what I just handed you as Exhibit
 2  Number 2, and then let me know after you've had a chance
 3  to look at it.
 4  A.     Okay.
 5  Q.     This Exhibit Number 2 -- Well, first of all, have
 6  you seen this news article before?
 7  A.     Yes.
 8  Q.     Okay.  And it -- I assume that we can agree that
 9  it's something that ran in the Chicago Sun Times around
10  December 6th.
11  A.     I would just have to trust what you have written
12  here.  I have no recollection of what document went
13  Q.     Okay.  Fair enough.
14         I'm really mostly interested in the third paragraph.
15  There's a quote there from you.
16  A.     Uh-huh.
17  Q.     To Bloomberg News, it's attributed.  And is that, in
18  fact, a statement that you made?
19  A.     Yes.  That was part of a statement that I wrote upon
20  my dismissal, shared with my attorneys, who in turn shared
21  and spoke with PR representatives at Wal-Mart and, in
22  fact, amended the statement based on suggestions from the
23  Wal-Mart PR representatives.
24         The agreed-upon statement between the two of us was
25  then what was released to the press.  And this is an
00010
 1  excerpt from that statement.
 2  Q.     Was this portion that was quoted, was that something
 3  that was amended based on any discussions with someone at
 4  Wal-Mart?
 5  A.     I cannot recall if it is this part of the statement
 6  that they asked us to amend or if it was another part.  I
 7  would have to go back and -- presumably, Wal-Mart has
 8  those records.
 9  Q.     When you said in the statement that "I was hired to
10  do a job as a change agent; my primary function here is
11  done," you know, can you elaborate a little bit on what
12  you meant by that?
13  A.     The primary functions, as discussed with me by my
14  then-supervisor, John Fleming, were to establish a
15  marketing communications organization, as well as to
16  complete an agency review.  Given that those were the
17  primary functions, those two had been largely completed at
18  that point in time.
19  Q.     Okay.
20         (Wherein, Deposition Exhibit 3 was marked.)
21  Q.     (Mr. Nelson continued.)  I suspect that you may have
22  a similar answer to my questions here, but take a moment
23  to review what's been marked as Exhibit Number 3.
24  A.     Yes.
25  Q.     Okay.  And there again in the second paragraph --
00011
 1  A.     Yes.
 2  Q.     -- there's a quote from a written statement that's
 3  attributed to you.  Is that the same written statement
 4  that you were just describing to me?
 5  A.     That is the statement that I prepared and, again,
```

```
 6    was shared with Mona Williams in the PR department at
 7    Wal-Mart by my attorneys and agreed upon as a statement
 8    after, again, they suggested an amendment, which we did,
 9    in fact, make.
10    Q.    Okay.  And you don't recall whether that amendment,
11    whatever it was, related to the portion that's quoted
12    here?
13    A.    This -- I do believe, to the best of my knowledge,
14    that this is the entire statement.
15    Q.    Oh.
16    A.    Therefore --
17    Q.    Okay.
18    A.    I believe so.  It feels like it.  It's been quite a
19    while since I've read it, but I believe that it is, in
20    which case the amended portion that she suggested would be
21    included in that.
22    Q.    Do you remember anything about the subject of this
23    amendment?
24    A.    I -- Again, to the best of my knowledge, there were
25    a few words that she asked to be changed.  And I honestly
00012
 1    cannot recall which those were.
 2    Q.    Okay.  I don't know whether I need to mark this
 3    other stuff, but we'll see.
 4          Let me just ask you.  There was a statement
 5    attributed to you back in January, around January 24th, I
 6    think, when you were speaking in New York.  It was just
 7    before you were speaking in New York --
 8    A.    Okay.
 9    Q.    -- when a reporter asked you, you know, where you
10    might relocate to next --
11    A.    Uh-huh.
12    Q.    -- is the way he reports it.  The quote from the
13    article is "To which she said someplace with a name that
14    doesn't end in ville."
15    A.    Uh-huh.
16    Q.    You remember that.
17    A.    Yes, I do.
18    Q.    Okay.  And is that more or less accurate in terms of
19    that exchange with the particular reporter?
20    A.    It was a portion of it.
21    Q.    Okay.
22    A.    I don't recall the entire context, but that was a
23    part of it.
24    Q.    Okay.  By that statement, I assume the point was
25    that, you know, wherever you were looking for work, it
00013
 1    wasn't in the Bentonville or Fayetteville, Arkansas, area.
 2    A.    Well, given that Bentonville is, I guess, a
 3    one-horse town, the opportunity to find employment equal
 4    to that which I had just experienced at Wal-Mart would be
 5    nearly impossible.  So yes, clearly, the idea of being
 6    able to stay in this town to further my career was not
 7    going to be a viable option.
 8    Q.    Okay.  Let me change gears, then, just a little bit.
 9    I want to ask you about a few e-mail messages.
10          (Wherein, Deposition Exhibit 4 was marked.)
```

11  Q.    (Mr. Nelson continued.)  Take a look at this e-mail
12  that we've marked now as, what, Exhibit 4, I guess.
13  A.    Uh-huh.
14         "  MR. NELSON:  Andy and Sam, I'm sorry.  I
15  should have brought one extra copy.  I hope you guys can
16  share okay down there.
17  A.    Uh-huh.
18  Q.    (Mr. Nelson continued.)  I'm sorry.  Do you have any
19  recollection of this e-mail exchange?
20  A.    I -- Not terribly.
21  Q.    Okay.  You can see, at least from the header
22  information, that this appears to be an e-mail exchange between
23  you and Mr. Womack --
24  A.    Uh-huh.
25  Q.    -- dated March 6 of 2006.  You know, anything about
00014
 1  it that causes you to think that it wasn't, in fact, what
 2  it purports to be?
 3  A.    I don't think I understand the question.
 4  Q.    Well, I mean is there anything about this that makes
 5  you think that this isn't, in fact, an e-mail exchange
 6  between you and --
 7  A.    Oh.
 8  Q.    -- Mr. Womack on that date?
 9  A.    No, I -- I would agree it very much looks like an
10  e-mail exchange between Sean Womack and myself, yes.
11  Q.    I guess I'm interested for the moment in the last
12  message in the exchange, which is --
13  A.    Uh-huh.
14  Q.    -- the first one listed on the page --
15  A.    Uh-huh.  Yes.
16  Q.    -- where it says "Okay, I seem to get depressed when
17  I land in Bville."
18         I guess first of all, do you recall making
19  statements to that effect to Mr. Womack or anybody else?
20  A.    I don't recall it, but clearly I wrote it.
21  Q.    Okay.  Why would you be depressed when you land in
22  Bville?
23  A.    It's -- again, I -- I don't recall, but it could be
24  because my family was still back in Detroit, and being
25  separated from them on a weekly basis is trying.  But I --
00015
 1  I couldn't say for certain whether or not that was the
 2  issue at the moment.
 3  Q.    Okay.
 4         (Wherein, Deposition Exhibit 5 was marked.)
 5  Q.    (Mr. Nelson continued.)  All right.  Let's see.
 6  This one is Exhibit Number 5.
 7  A.    Yes.
 8  Q.    Okay.  Do you recall this e-mail exchange that's
 9  marked as Exhibit Number 5?
10  A.    Vaguely.  I believe that you took excerpts of this
11  for the 82-paragraph counterclaim, which is the last time
12  I recall reading parts of it.
13  Q.    Okay.  Do you recall in March of '06 having an
14  exchange regarding these topics?
15  A.    You know, vaguely, I do recall the exchange.

16  Q.    Again, looking at the last message, which --
17  A.    Uh-huh.
18  Q.    -- ends up being the first one in the chain listed
19  on the paper.  When you say "It's the only way through
20  this" --
21  A.    Uh-huh.
22  Q.    -- what were you referring to there?
23  A.    Coming to Wal-Mart to set up a new organization in
24  an area where one hadn't existed before with a department
25  that, again, hadn't existed before creates, obviously,

1   challenges because of that reason.  Change is always
2   difficult for everybody.
3        So it's very often because you're trying to set up
4   an organization because you're -- the actual
5   infrastructure of the organization is not fully in place,
6   i.e. all the assistants aren't yet fully in place, your
7   staff is not fully in place, it can be very trying on
8   everybody because of the -- the time that has to be spent
9   traveling, the difficulties with arranging schedule, et
10  cetera.  So it was a statement that was really relating
11  specifically to that.
12  Q.    Were you experiencing frustration with that task at
13  this point?
14  A.    I can't recall if I was frustrated with the task of
15  helping him try to arrange the specific travel.  I -- I
16  don't recall that at this point.
17  Q.    Well, what about the broader issue that you just
18  described, you know, the difficulty with setting up the
19  marketing department as you envisioned it?
20  A.    It -- I don't think I would have considered it as
21  frustrating.  I think it was a bit what is expected when
22  you come in to set something up.  Things are going to be
23  more difficult when you don't have an organization or an
24  infrastructure in place.
25  Q.    Were you finding it more difficult than you

00017
1   expected?
2   A.    Probably at times.
3        (Wherein, Deposition Exhibit 6 was marked.)
4   Q.    (Mr. Nelson continued.)  All right.  We're up to
5   Exhibit 6.
6   A.    Okay.
7   Q.    And you see again from the header, this purports to
8   be an e-mail exchange again with Mr. Womack dated
9   April 4th of 2006.
10  A.    Uh-huh.
11  Q.    Do you have any recollection of this exchange?
12  A.    Very vaguely.
13  Q.    Again, you wouldn't quibble with this being what it
14  purports to be.
15  A.    No.
16  Q.    Okay.  April 4th, that was still before Mr. Womack
17  was a Wal-Mart employee, I believe; is that correct?
18  A.    I believe so.  I believe Mr. Womack became an
19  employee in June.
20  Q.    All right.  And I guess I didn't ask you.  You

```
21  became a Wal-Mart employee in February sometime?
22  A.    Yes.
23  Q.    What was the date?
24  A.    Feb 6 of '06.
25  Q.    Okay.  All right.  If you look at the second message
00018
 1  from the top or --
 2  A.    Yes.
 3  Q.    -- second to the last message chronologically,
 4  Mr. Womack makes a reference to when you start your
 5  marketing services company.
 6  A.    Uh-huh.
 7  Q.    Was that something that you and he discussed?
 8  A.    Never.
 9  Q.    Okay.  So this is just an idea that he came up with?
10  A.    Yes.  I -- yes.  I honestly don't know, but it's not
11  uncommon that people flippantly say things like that
12  periodically.
13  Q.    Okay.  Was that something that he commented on more
14  than this once?
15  A.    No, not that I recall.
16  Q.    All right.  And you write back "I'm counting on you
17  and your connections for the start-up now," I guess.  What
18  were you referring to there?
19  A.    He -- What I was referring to there, "I don't know
20  any trillionaires."  He had a friend that he talked about
21  who was a very wealthy gentleman who he'd worked with in
22  the past, so I was only making reference to that.  But
23  again, it was a tongue-in-cheek comment.
24  Q.    So whether or not it was a direct follow-up to this
25  e-mail that I just showed you, there did come a time when
00019
 1  you and Mr. Womack were talking about plans for sort of
 2  what you might do after Wal-Mart.
 3  A.    I think we had conversations about what
 4  opportunities might lie in the future, but that was it,
 5  normal conversations actually that you have with many
 6  people.
 7  Q.    Okay.  Did you talk about the timing of those
 8  opportunities?
 9  A.    No, not that I recall.
10  Q.    Did you talk about any specific business plans?
11  A.    Specific business -- Could you be more specific?
12  Q.    Either specific employers or starting your own
13  venture or partnering with some other entity?
14  A.    I -- It's possible we had conversations about what
15  the future might hold.  Specifically, I honestly don't
16  recall.
17        (Wherein, Deposition Exhibit 7 was marked.)
18  Q.    (Mr. Nelson continued.)  Take a look at what I've
19  marked as Exhibit Number 7.  Let me know when you have
20  reviewed it.
21  A.    Okay.
22  Q.    I guess the same sort of question.  Do you recall
23  this e-mail exchange?
24  A.    Vaguely.
25  Q.    Okay.  And do you recall -- As much as you recall
```

00020
```
 1  it, do you recall it happening around the date that's
 2  reflected in the header?
 3  A.    I do.
 4  Q.    Okay.  And it appears, from the last couple messages
 5  chronologically at the top of the first page, that the
 6  exchange is in reference to some discussions that you may
 7  have had the previous night.
 8  A.    It's -- it's possible.  It appears that we'd had a
 9  conversation the day before, yes.
10  Q.    Okay.  So if you look at the, I guess, third message
11  down --
12  A.    Uh-huh.
13  Q.    -- the one that has a time stamp of 1500 hours and
14  30 minutes 34 seconds, or basically 3:30 in the
15  afternoon --
16  A.    Uh-huh.
17  Q.    -- mr. Womack is saying "We needed to have one more
18  drink last night to talk about this."  It goes on, "I
19  promise not to spar," things along that nature.
20        But does that refresh your recollection that it may
21  have been over drinks the evening before?
22  A.    It -- it -- it doesn't spar my recollection, but I
23  read the same as you.
24  Q.    Let me ask you about the -- the first full message
25  that appears at the top of the second page.
```

00021
```
 1  A.    Uh-huh.
 2  Q.    The second paragraph there, I guess I'll just read
 3  it.  It says:  "You need to be on stage with me.  When you
 4  and I leave here, presuming we don't become sparring
 5  siblings, we both need to have a face in the industry."
 6  What was your -- what were you referring to there?
 7  A.    Sean, specifically, one of his primary concerns with
 8  becoming an employee full-time, which I believe happened
 9  right around that date, was that he would, A, be competing
10  with me.  He was concerned that we would have a
11  competitive spirit and that he would be marginalized.  And
12  that's primarily because he had a significant position at
13  his previous employer.  And so it was -- for him to give
14  that up, that was a major reservation that he had.
15        So this refers to my trying to encourage him that
16  this would be a good opportunity for him and that it was
17  going to give him a chance to do things on the client side
18  that would give him a presence on his own in the marketing
19  industry.
20  Q.    And is it still your contention that notwithstanding
21  the words "When you and I leave here, we both need to have
22  a face in the industry," that at this point, you weren't
23  talking with him about any future business plans?
24  A.    That's correct.  That statement was not stated as
25  when he and I leave there together.  It's just an
```

00022
```
 1  assumption that at some point, you leave a company.
 2  Lifetime employment is very rare these days.
 3        Also, when Sean was hired, John Fleming had asked
 4  him specifically to give him two or three good years, so
```

```
 5    Sean was always hired with the mind-set that he would only
 6    be there temporarily, being two to three years.
 7    Q.    And you know that from whom?
 8    A.    I know that both from John Fleming and from Sean
 9    Womack.  Both of them told me that.
10    Q.    So you weren't present for that.
11    A.    I was not present for that conversation.
12          (Wherein, Deposition Exhibit 8 was marked.)
13    Q.    (Mr. Nelson continued.)  All right.  We're up to
14    Number 8.  Have a look at that one.
15    A.    Okay.
16    Q.    Okay.  Can you find that -- Do you see it?
17    A.    I do.
18    Q.    And I assume that you received this e-mail exchange
19    at the Gmail address that's reflected.
20    A.    It's -- I believe so.
21    Q.    Okay.  Around August 20th?
22    A.    Yes, it appears so.
23    Q.    Okay.  Did -- Let me talk about the message from
24    Mr. Womack to Mr. Weisman and you.  Did you talk with
25    Mr. Womack about the content of that message before he
00023
 1    sent it?
 2    A.    No.
 3    Q.    Did he -- He didn't share the message with you
 4    before he sent it?
 5    A.    No.
 6    Q.    But you knew he was sending a message to
 7    Mr. Weisman.
 8    A.    I believe he told me that he'd sent one after he
 9    sent it.
10    Q.    I take it that this is a follow-up to some
11    discussions that you had had with Mr. Weisman in Chicago
12    the prior evening?
13    A.    I -- I don't -- I don't recall.  I don't know where
14    I -- if August 19th I was in Chicago.  I'm not certain.
15    Q.    Well, regardless of the location, you do recall that
16    this is a follow-up to some conversations that you had
17    with Mr. Weisman.
18    A.    I -- Obviously, I've had conversations with
19    Mr. Weisman at -- many times throughout the course of the
20    year.  Other than that, I mean I'm not certain what you're
21    looking for.
22    Q.    Okay.  Well, let's just -- We'll take it in small
23    steps, then.
24    A.    Okay.
25    Q.    The first sentence of Mr. Womack's message says:
00024
 1    "Julie and I spent the morning talking about our
 2    conversations with you, and we are both very interested in
 3    continuing this discussion."
 4    A.    Uh-huh.
 5    Q.    Okay.  First of all, do you remember some time spent
 6    in the morning of the 20th speaking with Mr. Womack about
 7    this?
 8    A.    I don't recall anything on August 20th.
 9    Q.    Okay.  Do you recall a conversation with Mr. Weisman
```

```
10   that related in any way to the topics reflected in this
11   e-mail?
12   A.    I recall having several conversations with
13   Mr. Weisman about their model, their P & L.
14   Q.    Okay.  Did you have any discussions with Mr. Weisman
15   about, you know, possible business opportunities, job
16   opportunities?
17   A.    Mr. Weisman had approached and commented to me in
18   the past that he felt that -- from his point of view, that
19   I didn't seem to be like all the other Wal-Mart employees.
20   He also stated that he felt that I might be somebody that
21   would be good to represent them working on the
22   Wal-Mart account on Wal-Mart's behalf on that side rather
23   than on the Wal-Mart side.
24   Q.    Okay.
25   A.    Should they ever win the business.
00025
 1   Q.    Were there other people there present when you were
 2   having that -- those discussions with Mr. Weisman?
 3   A.    I don't recall.  He -- again, he approached me with
 4   that commentary, and I don't recall if there was anybody
 5   else present when he did that.
 6   Q.    Do you remember where you were when he raised that?
 7   A.    No, I don't.
 8   Q.    And do you remember when it was?
 9   A.    No, but given the context of this, I'm going to
10   presume it was prior to August 20th.
11   Q.    Did you have any discussions along those lines in
12   the presence of Mr. Draft?
13   A.    With Mr. Draft suggesting it.  It's possible.  It's
14   possible.
15   Q.    Did you have those discussions in the presence of
16   anyone else from the Draft agency, Toby Sachs or any --
17   A.    Again, not that I recall.
18   Q.    Recognizing that you, I guess, don't have a specific
19   recollection of timing, do you recall how early in your
20   dealings with Mr. Weisman this subject came up?
21   A.    I don't.
22   Q.    And your testimony, I think -- I think you said
23   this.  I apologize if I'm repeating myself.  But your
24   testimony is you don't recall the conversation with
25   Mr. Womack that's referenced in the very first line of
00026
 1   that e-mail?
 2   A.    "Julie and I spent the morning talking about our
 3   conversations with you."  I don't recall that
 4   conversation.
 5   Q.    Okay.  I assume that you also received the response
 6   that's above from Mr. Weisman.
 7   A.    I'm going to assume so, too, since I can see my name
 8   on the -- my e-mail address in the to line.
 9   Q.    Do you -- You don't recall receiving it?
10   A.    The response?
11   Q.    Yes.
12   A.    I don't -- I don't recall receiving it, but it
13   looks -- it appears as though I did.
14   Q.    Okay.  Both in Mr. Weisman's response and in
```

15 Mr. Womack's original note, there's a reference to, you
16 know, trying to advance these discussions between that
17 date and the 20th.  Do you have any recollection whether
18 that referred to September 20th, given that this was on
19 August 20th?
20 A.    I don't.
21 Q.    Were there some follow-up discussions revolving
22 around these issues?
23          MR. MORGAN:  Let me object to the form of
24 the question.  I think you're getting beyond the limited
25 nature and subject matter of the deposition.

1          Unless you're getting into -- and you limit
2 your questions to discussions about a job offer and
3 relocation, which would relate to domicile, this question
4 and the breadth of it is ambiguous and it's overbroad.
5          So it -- it calls for information that's not
6 relevant to the subject matter of this deposition.
7          MR. NELSON:  Okay.  Well, I -- I think I
8 limited it to the subject matter of this e-mail, which
9 pretty clearly goes to discussions about job
10 opportunities.
11          MR. MORGAN:  Your question was -- and I
12 understand that this deposition --
13          MR. NELSON:  We don't have to argue about
14 that.
15          MR. MORGAN:  -- is limited to domicile --
16          MR. NELSON:  Right.
17          MR. MORGAN:  -- issues of domicile, which I
18 think you can shortcut this route and get to talking about
19 any discussions about a job offer and relocation rather
20 than any discussions.
21          MR. NELSON:  Okay.  Well, your objection has
22 obviously been noted.
23 A.    I was not given a job offer by Mr. Weisman at any
24 point in time.
25 Q.    (Mr. Nelson continued.)  Okay.  And I -- That wasn't

00028
1 specifically what I asked.
2 A.    Okay.  Sorry.
3 Q.    Short of a job offer, I guess I was asking, did you
4 have any subsequent discussions with Mr. Weisman about
5 this exploration of possible opportunities?
6 A.    The only discussion I recall having with him about
7 this was that if, in fact -- if, in fact, we wanted to
8 discuss this, we would have to talk to John Fleming about
9 whether or not he thought it would also be a good idea to
10 represent Wal-Mart from the other side.
11          But given that it was all a moot point until the
12 review was completed, it wasn't worth the conversations.
13 That and there are policies where -- from a Wal-Mart
14 perspective, my understanding is that you cannot work for
15 a supplier.  So I told him after -- at some point after
16 this that the likelihood of that would be very, very
17 remote.
18 Q.    What about with Mr. Draft, any other discussions
19 regarding these subjects with Mr. Draft?

```
20  A.    Again, I'm not certain.  He may have been present,
21  but I honestly -- I don't recall if he was there.
22  Q.    Was Mr. Womack accurate when he stated at the end of
23  the first sentence in his message that "We're both very
24  interested in continuing this discussion"?
25  A.    Again, it's very difficult for me to say, because
00029
 1  the first part of that sentence with which that is
 2  modifying, I don't recall that conversation.
 3  Q.    Did you ever respond to this e-mail string?
 4  A.    Not that I recall.
 5  Q.    The end of the first message when he states that let
 6  us get back to you in a day or so with some thoughts on
 7  the best way forward," when he uses the word "us," do you
 8  have any sense of who he was referring to?
 9  A.    I don't.
10  Q.    Let me ask you to look at the second paragraph on
11  the second page.
12  A.    Okay.
13  Q.    Begins with:  "So what is your time frame.  What do
14  the next 60-360 days look like for you guys?"
15        There's, I guess, a reference or a statement
16  attributed to you at the end of that.  It says:  "I know
17  Julie has said next birthday, but we do need to understand
18  your key milestones as well."  What was Mr. Womack
19  referring to there?
20  A.    I don't know.  I don't know.
21  Q.    I guess just for the record, your birth date is
22  September 15th?
23  A.    Yes.
24  Q.    1970?
25  A.    That's correct.
00030
 1  Q.    In the paragraph just above that --
 2  A.    Uh-huh.
 3  Q.    -- the last -- second to the last sentence says:  "I
 4  know we discussed this briefly, but there really are some
 5  relational constraints on our end that makes this tricky."
 6  Do you have any recollection of what Mr. Womack was
 7  referring to there?
 8  A.    No.
 9  Q.    I'm going to change gears a little bit again.  I
10  want to talk about your -- well, let's start with your
11  home in Michigan.
12  A.    Uh-huh.
13  Q.    How long have you owned that property?
14  A.    I believe the -- the purchase -- we closed on the
15  property in, I believe, August of 2001.
16  Q.    And before you lived at that home, where -- where
17  did you live?
18  A.    I was -- that -- we -- Prior to that house, we lived
19  in a home in Saline, Michigan.
20  Q.    Okay.  Did you own or rent?
21  A.    We owned that home.
22  Q.    Okay.  And roughly how long did you own that home?
23  A.    Two and a half years maybe.
24  Q.    I won't make you go back --
```

```
25  A.     Two years.
00031
 1  Q.     Oh, I'm sorry.
 2  A.     Yeah, two years.  I'm trying to think of the time
 3  frame.
 4  Q.     Okay.  I started to say I won't make you try to go
 5  back and list everywhere that you've possibly been, but
 6  roughly how long did you live in Michigan, those homes and
 7  anywhere else that you may have resided?
 8  A.     In Michigan in total?
 9  Q.     Yes.
10  A.     Consecutively?
11  Q.     Well, let's start with consecutively, sure.
12  A.     I was transferred to Michigan from California by
13  Ford in 1998.  Right.  In 1998.  And we lived in the home
14  in Saline until we sold that and moved to the home in
15  Rochester Hills, which -- so 1998.  And then we left June
16  of '06, so eight -- a little less than eight years.
17  Q.     Now, you asked me consecutively.  That suggests that
18  I guess you had been in Michigan previous?
19  A.     That's correct.
20  Q.     Prior to '98, when was the last time you lived in
21  Michigan?
22  A.     I -- Upon my employment at Ford Motor Company, which
23  commenced in 1995.  And I was transferred in 1996 to
24  California.  So one year.
25  Q.     Okay.  So you lived in California for, what,
00032
 1  approximately two years in between?
 2  A.     Correct.  Just a little under, yes.
 3  Q.     Okay.  All right.  Going back to your -- to the home
 4  in Michigan, I understand that that is, at least to the
 5  best of my knowledge, currently listed for sale; is that
 6  correct?
 7  A.     Yes.
 8  Q.     And when did you list that for sale?
 9  A.     I listed that home for sale shortly after I accepted
10  the position with Wal-Mart.
11  Q.     Okay.  I assume it has been continuously listed
12  since that time?
13  A.     Yes, that's correct.
14  Q.     And I believe it's correct that you listed the home
15  through a relocation service that was provided by
16  Wal-Mart; is that correct?
17  A.     That's correct.
18  Q.     Do you recall that relocation service providing you
19  with a suggested listing price?
20  A.     I believe that was part of the policy, yes, was to
21  provide a price based on estimates that were given by
22  appraisers.
23  Q.     And do you recall that when you listed the house,
24  you listed it for a price higher than that recommended,
25  that suggested price?
00033
 1  A.     I don't recall what the recommended price was.  We
 2  listed the price based on the recommendation of our real
 3  estate agent.
```

```
 4   Q.    Who was someone different than the service that
 5   Wal-Mart had provided or...
 6   A.    No.  Wal-Mart provided a service to, I guess, help
 7   with the operations of the transaction, but I needed to
 8   interview specific real estate agents.  And they helped to
 9   secure which of the real estate agents to interview with,
10   from which then I selected one.  So that was part of their
11   process.
12   Q.    Do you recall whether whatever the recommendation of
13   the agent may have been or whatever the basis was for the
14   listing price that you settled on, you do recall that it
15   was higher than what the agent recommended to you or
16   recommended?
17   A.    No, I don't recall that.  I don't recall what the
18   price was.
19   Q.    Since the home has been listed, have you received
20   any offers on the home?
21   A.    We did.  We did receive one.
22   Q.    Was that a written offer?
23   A.    Not that I know of.  I believe it was a verbal.
24   Q.    And I take it you didn't accept it.
25   A.    Correct.  I wish I had now --
00034
 1   Q.    Okay.
 2   A.    -- given the way the market has continued to
 3   deteriorate.
 4   Q.    When about was that offer?
 5   A.    I don't recall the date.  I recall it was quite warm
 6   here, and so I'm thinking it was sometime late summer, but
 7   I don't recall the date.
 8   Q.    Late summer of '06.
 9   A.    '6, correct.
10   Q.    I also understand that over time, you have reduced
11   the asking price.
12   A.    That's correct.
13   Q.    And I think, if I recall correctly, in January of
14   this year, you reduced it.
15   A.    That's right.
16   Q.    Have you changed -- changed the asking price since
17   January?
18   A.    No.  What we are doing to try to move the home is
19   put other incentives with the home.  So, for instance, six
20   months of free lawn mowing, groceries, so -- Our real
21   estate agent has recommended that those kinds of
22   incentives seem to be creating interest.  So we're doing
23   that.
24   Q.    Just so I can get the -- I guess the chronology
25   correct, I think I understand that your husband and your
00035
 1   children continued to live in that home until, what,
 2   mid-June of '06, roughly?
 3   A.    That's correct, until the children finished school,
 4   the school year.
 5   Q.    All right.  Since -- since June of '06, has anyone
 6   else lived in the home or resided in the home temporarily?
 7   A.    In Rochester Hills, Michigan?
 8   Q.    Yeah.
```

```
 9  A.     No.
10  Q.     Okay.  You haven't had any renters or family members
11  who have stayed there or anything?
12  A.     No.  The home is empty.
13  Q.     Again, correct me if I'm wrong, but I think what I
14  understand, from looking at the documents, is you closed
15  on the house here in Arkansas around that same time,
16  mid-June of 2006?
17  A.     I believe that's right.
18  Q.     Okay.  Looking at -- back at -- I can show you if we
19  need to, but looking back at your travel records, your
20  corporate travel records, looks like most weekends, the
21  exception of one weekend, basically from February to the
22  middle of June --
23  A.     Uh-huh.
24  Q.     -- you spent the weekends back in Detroit.
25  A.     That's correct.
00036
 1  Q.     Okay.  Before I go on, while we're on just that
 2  issue of traveling to Detroit, I want to ask you about a
 3  couple of the documents that you provided to us through --
 4  A.     Sure.
 5  Q.     -- through your attorneys.
 6  A.     Okay.
 7  Q.     I guess we can mark this as an exhibit.
 8         (Wherein, Deposition Exhibit 9 was marked.)
 9  Q.     (Mr. Nelson continued.)  Go ahead and take a minute
10  to look at what's marked as Exhibit Number 9.
11  A.     Uh-huh.
12  Q.     I just want to ask you a couple questions.
13  A.     Okay.
14  Q.     Probably because I'm not real familiar with how
15  Northwest reflects its travel, but I was trying to figure
16  out exactly which dates you were in Detroit as reflected
17  by this.
18  A.     I'm -- I -- well, the first sheet --
19  Q.     Okay.
20  A.     -- is an itinerary.  So clearly I was there on
21  April 3rd for just the day, flying in in the morning,
22  flying out in the afternoon on Tuesday, April 3rd.
23  Q.     Do you remember the reason for that trip?
24  A.     No.  No.
25  Q.     Was -- I'm sorry.
00037
 1  A.     No.  The only -- if I had to take a guess, which
 2  probably nobody wants me to do, but it was probably --
 3             MR. MORGAN:  Don't take a guess.
 4  A.     Don't -- no guessing.
 5  Q.     (Mr. Nelson continued.)  I don't want you to guess,
 6  but...
 7  A.     I don't know.
 8  Q.     Do you remember any of the activities that you
 9  engaged in during --
10  A.     No.
11  Q.     I mean it was basically a month ago, April 3rd.
12  A.     A month --
13  Q.     Month and a week.
```

14    A.    Oh, a month ago.  Oh, I'm sorry.  You know, I'm
15    sorry.  I was reading this as 2006.  My apologies.
16          I was meeting with my attorneys.
17    Q.    Oh, okay.
18    A.    Sorry.  I know exact --
19    Q.    I don't want to know what you talked about again.
20    A.    No, I am not telling you.
21    Q.    Okay.  Good.
22          All right.  So that's the first page.
23    A.    Yes.  Sorry.  I thought it was '06.
24    Q.    Okay.  Turning to, then, the next page, your account
25    summary.

00038
 1    A.    Yes.
 2    Q.    Maybe we should just work down the list here.  We've
 3    got --
 4    A.    Uh-huh.
 5    Q.    -- your air award activity column first.
 6    A.    Uh-huh.
 7    Q.    It appears that there's an award ticket for travel
 8    on March 28th of this year.
 9    A.    Uh-huh.
10    Q.    Did you make that trip?
11    A.    I -- I don't know.
12    Q.    Okay.
13    A.    I'm not trying to be difficult.  I just -- I don't
14    recall.
15    Q.    You don't remember whether you were in Detroit?
16    A.    I don't recall.  I don't recall.
17    Q.    Well, maybe rather than going through each of these,
18    why don't you tell me which of these trips you do recall
19    making.
20    A.    I don't recall any of the dates specifically, but I
21    know that in the month of March, I did make a trip to meet
22    with my attorneys, so...
23    Q.    Just a single trip?
24    A.    At least one.  It was at least one, so...
25    Q.    Okay.  Well, I see on here --
00039
 1    A.    Uh-huh.
 2    Q.    -- that someone -- before we received the document,
 3    someone had highlighted, looks like five trips that
 4    Detroit was either the destination or the departure point.
 5    A.    Yes.
 6    Q.    Did -- Was that your highlighting?
 7    A.    Yes.
 8    Q.    Okay.  And I guess why did you highlight it?
 9    A.    It was in response to the subpoena, I believe,
10    requesting all travel documents to and from Detroit, so I
11    was highlighting the Detroit routes.
12    Q.    Well, recognizing that you may not, you know, recall
13    specifically dates of travel, does that sound about right,
14    that you may have made four or five trips to Detroit in
15    March?
16    A.    No.  Four or five trips does not sound right.
17    Q.    Okay.
18                MR. MORGAN:  Karl, you may benefit from

19 knowing that Detroit is a hub for Northwest.
20          MR. NELSON: Okay. And that's fine. I'm
21 trying to just understand --
22 A.    Uh-huh.
23          MR. NELSON: -- whether she was just flying
24 through or -- you know, it's kind of hard to tell here,
25 because at least as I read it, there's no times associated
00040
1 with it, so it's hard to know whether it was --
2          MR. MORGAN: If you fly Northwest, you will
3 end up going to Detroit a lot, you go to Memphis a lot,
4 Minneapolis
5          MR. NELSON: I have been in Detroit. I've
6 spent the night in Detroit thanks to Northwest, so I try
7 not to do that anymore.
8 A.    It's a really nice new terminal, though.
9 Q.    (Mr. Nelson continued.) Well, the motel I was in
10 wasn't very nice and new, so...
11 A.    Oh.
12 Q.    But that's an aside.
13      Again, I'm not trying to be tricky or anything. I'm
14 just trying to understand this document.
15 A.    I'm not trying to be tricky either. I know I was in
16 Detroit in the month of March; and as Mr. Morgan has
17 stated, some of these trips may have just been connections
18 through.
19 Q.    Well, let's look at the -- let's try the last
20 section there where it says "Mileage activity." I assume
21 that that would reflect flights you actually took,
22 regardless of whether they were ticketed or not.
23 A.    I believe so, yes.
24 Q.    Okay. So that suggests that -- if I'm reading it
25 correctly, that on April 16th -- Well, let's start at the
00041
1 bottom since again they're in reverse chronological order,
2 I guess. On March 28 --
3 A.    Okay.
4 Q.    -- it looks like -- you didn't highlight March 26,
5 but it looks like maybe on March 26, there was a flight
6 from --
7 A.    Oh.
8 Q.    -- XNA to Minneapolis and then Minneapolis to
9 Detroit.
10 A.    XNA to Minneapolis, Minneapolis to Detroit. It does
11 appear to be, yes.
12 Q.    Okay. And then it looks like you spent a couple of
13 days in Detroit, and then flew out from Detroit direct to
14 XNA on the 28th.
15 A.    It appears to be.
16 Q.    Okay. Do you recall that trip?
17 A.    Not specifically, but the trips I -- the trips I
18 made to Detroit were to see my lawyer expressly. The only
19 other trip I have made recently was to speak at a
20 conference, so...
21 Q.    Okay. Do you recall, on a trip like that where you
22 stayed over, it appears two nights --
23 A.    Uh-huh.

```
24  Q.      -- where you stayed?
25  A.      Stayed with -- I believe I stayed with friends.
00042
 1  Q.      April 3rd --
 2  A.      Yes.
 3  Q.      -- it looks like -- I guess LaGuardia to Detroit and
 4  Detroit to -- what is EWR?  I don't know what airport code
 5  that is.
 6  A.      I don't either.
 7                  MR. RIFKIN:  EWI?
 8                  THE WITNESS:  EWR.  EWR.
 9                  MR. RIFKIN:  Newark.
10                  THE WITNESS:  Is Newark EWR?  It might be.
11  That might be Newark.
12  Q.      (Mr. Nelson continued.)  Okay.  So LaGuardia to
13  Detroit and Detroit maybe to Newark?
14  A.      Uh-huh.
15  Q.      In any event, I assume you might have some
16  recollection of that trip.
17  A.      Yes.  Given that it happened all on the same day, it
18  appears, yes, I do.  Yes.
19  Q.      So that was a layover in Detroit?
20  A.      No.  I believe I was seeing my attorneys.
21  Q.      Oh, okay.  All right.  Then, again, we've got -- I
22  guess moving toward the top, we've got April 5th.  No.
23  I'm -- yeah, April.
24  A.      I have it highlighted, but I'm not sure why.
25  Q.      Trying to -- yeah.  Okay.  I'm not sure even why it
00043
 1  was -- oh, I guess --
 2                  MR. MORGAN:  It's an award of miles.
 3  Q.      (Mr. Nelson continued.)  -- that's an entry for the
 4  WorldPerk Visa miles.  Okay.
 5          So April 16th, we've got XNA to Minneapolis,
 6  Minneapolis to Detroit.  And somehow you got back from
 7  Detroit.
 8  A.      It looks like the page before, Detroit to LaGuardia,
 9  on the next day.
10  Q.      On the next day.  So that was just a one-day --
11  one-night stay.
12  A.      Uh-huh.
13  Q.      There again, I guess, what, did you stay with
14  friends or...
15                  MR. MORGAN:  On the 16th is what you're
16  asking?
17                  THE WITNESS:  Yes.
18                  MR. NELSON:  Yeah.
19  A.      I believe that's when I spoke -- no.  I believe that
20  that had -- that was when I spoke at the iMedia conference
21  in Dearborn.  And so in that case, I would have stayed at
22  the Dearborn Ritz --
23  Q.      (Mr. Nelson continued.)  Okay.
24  A.      -- as part of the conference.
25  Q.      Okay.  Now, this --
00044
 1  A.      In fact, I'm quite sure of that.
 2  Q.      Okay.
```

```
 3  A.    Yes.
 4  Q.    These all -- These records all seem to relate to
 5  travel on Northwest.
 6  A.    Uh-huh.
 7  Q.    Have you traveled to Detroit in the last few months
 8  via any other mode of transportation?
 9  A.    Oh, any other mode of transportation?  No, not any
10  other mode.
11  Q.    Well, yeah.  Any other carrier?
12  A.    Oh.  Potentially.
13  Q.    I tried to make it as broad as possible.
14  A.    Yes, I tried to make it as broad, specific as
15  possible.
16        Yes, it's possible.
17  Q.    Okay.  Do you recall any?
18  A.    I don't recall them, but it's possible.
19  Q.    I guess I asked you earlier about the house here in
20  Arkansas, and you said that you purchased that mid-June of
21  2006, roughly.
22  A.    We closed on it mid-June.
23  Q.    Okay.
24  A.    The offer was in quite a bit before that, as I
25  recall.
00045
 1  Q.    Wal-Mart assisted you with the purchase of that
 2  house --
 3  A.    That's --
 4  Q.    -- as well as with the sale of the Michigan
 5  property; correct?
 6  A.    Wal-Mart assisted -- assisted.
 7  Q.    Okay.  Again, I'm not trying to be vague.  I
 8  think --
 9  A.    Uh-huh.
10  Q.    -- by the offer letter, they paid closing costs.
11  A.    I believe that's right.
12  Q.    And I think they either offered to or did set you up
13  with a real estate agent, local real estate agent here.
14  A.    Here, they -- yes.
15  Q.    Yeah.  Okay.
16  A.    Uh-huh.
17  Q.    I don't know, are there other things that they did?
18  A.    Just the relocation company.
19  Q.    Now, the house here is also listed for sale;
20  correct?
21  A.    That's correct.
22  Q.    And when did you put that house on the market?
23  A.    It was within days of being fired from Wal-Mart.
24  Q.    If I -- if I told you that the, you know, record
25  search suggests December 7th --
00046
 1  A.    Uh-huh.
 2  Q.    -- 2006, that sound about right?
 3  A.    That does.
 4  Q.    Okay.  I guess while we're talking about the
 5  relocation issues in the offer letter, I'll just ask you a
 6  couple questions about that.
 7        (Wherein, Deposition Exhibit 10 was marked.)
```

8   Q.    (Mr. Nelson continued.)  Exhibit 10, I believe we
9   can agree, is the employment offer letter you received
10  from Wal-Mart.
11  A.    Yes.
12  Q.    Okay.  Take as much time as you want to to review
13  it, but I assume that you're generally familiar with it.
14  A.    Yes.
15  Q.    I just want to ask you a couple questions about
16  Roman Numeral III entitled "Relocation."
17  A.    Yes.
18  Q.    So under the first part of that section, A, it
19  provides th to
20  Arkansas.
21  A.    Correct.
22  Q.    And I assume that Wal-Mart provided those benefits.
23  A.    Yes.
24  Q.    Okay.  Let me jump down to C.  It talks about this
25  75,000-dollar after-tax amount to assist with sort of, I
00047
1   guess, a budget of all kinds of expenditures.
2   A.    Uh-huh.
3   Q.    It says "En route expenditures, temporary living
4   expenditures, incidental expenditures."
5         It goes on to say in the next paragraph, which isn't
6   designated by a new letter, that within the relocation and
7   temporary living allowance, there's been an allocation for
8   six months of temporary living.
9   A.    Uh-huh.
10  Q.    Let me just stop there for a minute and ask you,
11  before you closed on your house here, were you living in
12  an apartment, or where did you live while you were in
13  Arkansas?
14  A.    I lived at the Hampton Inn.
15  Q.    Okay.  So I assume that in part, that grossed-up
16  $75,000 is intended to help cover that cost.
17  A.    That's correct.
18  Q.    After you closed on the house here --
19  A.    Uh-huh.
20  Q.    -- as I understand this, it -- I think I understand.
21  Let me ask you.  Did Wal-Mart cover your mortgage payments
22  in Michigan for six months?
23  A.    Yes.
24  Q.    Okay.  And I guess if I'm reading this correctly -
25  you tell me if you had a different understanding - it says
00048
1   that Wal-Mart will cover your -- I guess the lesser
2   mortgage --
3   A.    That's --
4   Q.    -- for six months.  And then the last sentence says
5   "This benefit may be extended based on discussions with
6   your direct supervisor provided that you've engaged
7   Wal-Mart's relocation team for the marketing of your
8   home."  So it left open the prospect that they might cover
9   the double mortgage problem for some time beyond six
10  months.
11  A.    That's correct.
12  Q.    Okay.  And you had, in fact, engaged Wal-Mart's

13  relocation team --
14  A.     Yes.
15  Q.     -- for the sale in Michigan; right?
16  A.     Sorry.  Just to clarify Wal-Mart's relocation team.
17  I was engaged with SIRVA, who, based on this conversation,
18  I'm assuming that that is the proxy for the Wal-Mart's
19  relocation team, just to be clear.
20  Q.     Fair enough.
21         Did you have any discussions with Mr. Fleming or
22  others at Wal-Mart about when you would be actually moving
23  your family down, the timing of that?

24  A.     I'm
25  Q.     Did you -- Well, do you recall any of those
00049
 1  discussions?
 2  A.     I don't recall specific discussions, but we talked
 3  obviously casually with John Fleming, myself, others,
 4  about the homes we were building, the construction issues
 5  that everybody in northwest Arkansas has, the timing of
 6  getting family in, all of that.
 7  Q.     Your attorneys provided us, I believe it was just
 8  yesterday, with a photocopy of what appears to be your
 9  driver's license.
10  A.     Okay.
11  Q.     I -- Because it's a photocopy or a fax copy, it's a
12  little bit hard to read.  I just want to make sure that
13  I'm understanding it correctly.
14  A.     I can give it to you here.
15  Q.     Well, you're welcome to, but I don't -- I won't --
16  you don't need to.
17  A.     Okay.
18  Q.     I just want to make sure that -- find it.  What I
19  received appears to be a Michigan driver's license.
20  A.     That's correct.
21  Q.     Okay.  And I can't -- Frankly, I can't read much of
22  the printout.  Let me just ask you, how long have you had
23  a Michigan driver's license?
24  A.     Since sometime after I moved there.  I don't know
25  exactly.
00050
 1  Q.     Did you get a Michigan driver's license the first
 2  time you lived there?
 3  A.     I don't know.  And again, I'm not being difficult,
 4  but when I moved to Michigan the first time, I was single.
 5  We -- I got married after I was living in Michigan for a
 6  few months.  So it's very possible that I didn't for quite
 7  some time, because I was going to be married and my name
 8  was changing and everything else, so...
 9  Q.     Okay.  Would you have -- if you recall, did you get
10  a new driver's license after your name changed?
11  A.     I did, because I had to give many new documents with
12  my new legal name.
13  Q.     So this would have been after you got married,
14  before the two-year, year-and-a-half, whatever the stint
15  was in California.
16  A.     That's correct.
17  Q.     When you moved to California, did you get a

18  California driver's license?
19  A.    I believe I did.  I believe I did.
20  Q.    So then you got a -- you changed your license to
21  Michigan when you moved back.
22  A.    At some point.  I think it was -- I think it was
23  quite some time before I did; but eventually, yes, I did.
24  Sometime during that eight-year consecutive stint, I'm
25  certain I did.
00051
1  Q.    All right.
2  A.    In fact, obviously, I know I did.  Yes.
3  Q.    All right.
4  attorneys having produced this to us, that you don't have
5  an Arkansas driver's license.
6  A.    That's correct.
7  Q.    I suppose I should be a little more precise, because
8  I don't mean to be vague.  You said that you were in
9  California from sometime in '96 to sometime in '98, I
10  believe?
11  A.    That's correct.
12  Q.    Can you put a month on it or give me anything -- any
13  better idea how long you were there?
14  A.    Sometime in the summer of '96 and then spring of
15  '98, I believe, so I think it was just shy of two years.
16  Q.    Okay.  I understand that you still have a bank
17  account in Michigan with an entity that goes by DFCU?
18  A.    That's correct.
19  Q.    Is that Detroit Federal Credit Union?
20  A.    No.  It's Dearborn Federal Credit Union.
21  Q.    Dearborn Federal Credit Union.  Okay.
22      I assume that's an account that you opened when you
23  were living in Michigan.
24  A.    Yes.  In fact, I believe I opened it when I lived in
25  Michigan the first time, so prior to the California stint.
00052
1  Q.    Okay.  So you kept it while you were in California?
2  A.    Yes, I believe so.
3  Q.    Then obviously when you were back in Michigan for
4  the longer time.
5  A.    Yes.
6  Q.    And you still have that account.
7  A.    Yes.
8  Q.    And that's the account -- if I'm looking at the
9  documentation correctly, that's the account that you had
10  your payroll deposited in by direct deposit while you were
11  working at Wal-Mart?
12  A.    Yes, that's true.
13  Q.    Okay.  So that was the account that you used as sort
14  of your main checking account during that time?
15  A.    That's correct.
16  Q.    What about -- You may recall that we had requested
17  voter registration information.
18  A.    Right.
19  Q.    At least as of the last thing I'd heard, you had had
20  trouble finding that.
21  A.    And we still haven't located it.  My -- just to be
22  clear with the voter registration, my recollection is that

```
23    when I purchased my new vehicle down here at a local
24    dealership in the Bentonville/Rogers area, going to
25    register the vehicle and pay the taxes on it, there were
00053
 1    at least two different offices that you had to go to to
 2    accomplish that task as it exists here for the State of
 3    Arkansas.
 4         And it is my recollection that there was a sheet of
 5    paper as part of the registration of your vehicle that was
 6    also voter registration.  That -- so I -- That is in my
 7    mind that I did that, but I don't have a card that states
 8    that.
 9    Q.   When would that have been?
10    A.   I reg -- I purchased and registered my vehicle, it
11    would have been late last spring, in '06, so I don't --
12    honestly.  It's late last spring, something like that.
13    Q.   Well, let's go ahead.  We'll just mark this as an
14    exhibit, I guess.
15         (Wherein, Deposition Exhibit 11 was marked.)
16    Q.   (Mr. Nelson continued.)  I wasn't actually planning
17    to mark it, so I'm sorry, guys, I don't have an extra
18    copy, but I'm sure your attorneys can look on.
19    A.   I'll share it.
20    Q.   This is what's been marked as Exhibit Number 11.  I
21    just want to show you it to you so you don't think I'm
22    being cagey.  That reflects that as of at least last week,
23    the Arkansas Secretary of State -- I'll just represent to
24    you that the Arkansas Secretary of State has no record of
25    you being a registered voter in Arkansas.
00054
 1    A.   Okay.
 2    Q.   I mean could that, in fact, be accurate?
 3    A.   It -- it's possible.  Again, I thought for certain
 4    that there was a sheet that I had checked.
 5         I know that that's the process that they use in
 6    Michigan, as well.  That's how you register to vote, when
 7    you register your vehicles.
 8         So I -- I fully had a recollection that there was a
 9    sheet of paper that I marked for -- is it possible that it
10    wasn't a voter registration now that you're showing this;
11    it was some other registration?  It's possible.  But I
12    fully believed -- I would have gone to the polls next year
13    to vote for our President, believing that I was
14    registered.
15    Q.   I guess that's a fair point.
16    A.   Okay.
17    Q.   I take it that you didn't vote in the November
18    elections here in Arkansas last year.
19    A.   That's correct.
20    Q.   Or in any elections in Arkansas since you've been
21    here.
22    A.   That's correct.
23         I don't typically vote in state elections.  I'm not
24    sure if that makes me a bad person, but I just never have.
25    Sorry.
00055
 1    Q.   Okay.  Well, Ms. Roehm, thank you.
```

```
 2              MR. NELSON:  I think that's all I have on
 3  these issues, guys.
 4  A.     Okay.
 5                      EXAMINATION
 6  BY MR. MORGAN:
 7  Q.     I've got a question related to the last question you
 8  were asked.
 9  A.     Okay.
10  Q.     Did you vote in Michigan in November of 2006?
11  A.     No.
12  Q.     Did you vote anywhere in November of 2006?
13  A.     No.
14              MR. MORGAN:  Can we take a minute?
15              MR. NELSON:  Uh-huh.
16  (Wherein, a break was taken from 1:36 p.m. to 1:55 p.m.)
17  Q.     (Mr. Morgan continued.)  While you're on that very
18  topic --
19  A.     Yes.
20  Q.     -- where were you born?
21  A.     I was born in Watertown, Wisconsin.
22  Q.     How long did you live in Wisconsin after you were
23  born?
24  A.     I was born?
25  Q.     Yeah.
00056
 1  A.     Till I was four.  I'm going to have to --
 2  Q.     Okay.  I'm not going to go --
 3  A.     I can tell you -- oh, okay.  I was going to say I
 4  can do it.
 5         I've lived there again after that, but four the
 6  first time.
 7  Q.     Okay.  And before you accepted a job and moved to
 8  Michigan in 1995 --
 9  A.     Yes.
10  Q.     -- to work for Ford Motor Company, where did you
11  live?
12  A.     I was in Chicago, Illinois, completing graduate
13  school.
14  Q.     And you went to which college?
15  A.     Graduate school?
16  Q.     Graduate school.
17  A.     Graduate school.  University of Chicago, the
18  graduate school of business.
19  Q.     Where did you go to college?
20  A.     Purdue University.
21  Q.     Where did you attend high school?
22  A.     Ursuline Academy, which is in -- it's a suburb of
23  Cincinnati; Blue Ash, Ohio.
24  Q.     Where do your parents live?
25  A.     Seattle.  A suburb, Kirkland, Washington.
00057
 1  Q.     Do you have any family in Michigan?
 2  A.     No.  I've never had family in Michigan, actually.
 3  Q.     Defense counsel asked you some questions related to
 4  Exhibits 2 and 3 on --
 5  A.     Uh-huh.
 6  Q.     -- what you described as joint or mutually approved
```

7    statements that were released to the press.
8    A.    Uh-huh.  Yes.
9    Q.    And who was your immediate supervisor while you were
10   employed at Wal-Mart?
11   A.    John Fleming.  At the time, he was EVP of marketing
12   slash CMO.
13   Q.    Did Mr. Fleming ever tell you that your employment
14   with Wal-Mart was for a limited or defined term or
15   duration related to a project?
16   A.    No.
17   Q.    Did you ever have an understanding that your
18   employment with Wal-Mart would be for any specific
19   duration of time?
20   A.    No.  But I also understood that I could not count on
21   job security for an indefinite period of time.
22   Q.    And how did you know that?
23   A.    Because they make it fairly clear, both publicly and
24   I believe in the -- in my employment letter, that it's an
25   at-will state and they can terminate my employment at any
00058
1    point in time, I believe, something to that effect.  I'm
2    sorry.  I've gotten out of order with the exhibits.
3    Q.    All right.  It's Exhibit 10.
4    A.    Ten.
5    Q.    You don't need to look for it.
6    A.    Okay.  I'm certain it's in there somewhere.
7    Q.    I want to ask you some questions about Exhibit 1.
8    A.    Okay.
9    Q.    And specifically, if you could turn to page 4 of
10   Exhibit 1, which is your complaint.
11   A.    Uh-huh.
12   Q.    And paragraph number 11 of the complaint.  In the
13   complaint, you allege that "Based upon and in reliance
14   upon the covenants made by defendant in the agreement,
15   plaintiff temporarily relocated her husband and children
16   from their home in Rochester Hills, Michigan, to a house
17   in Bentonville, Arkansas, and commenced work for defendant
18   on February 6 of 2006."
19   A.    Uh-huh.
20   Q.    Okay.  As I understand your testimony, you did not
21   actually relocate your husband and children from their
22   home -- your home in Rochester Hills until sometime after
23   February 6 of 2006.  Is that accurate?
24   A.    That's true.
25   Q.    All right.  So to the extent that exhibit --
00059
1    paragraph 11 indicates that your family relocated in
2    February, that's -- that's -- that would be an incorrect
3    interpretation?
4    A.    That would be incorrect interpretation.
5    Q.    Okay.  When you said that -- in the complaint that
6    you temporarily relocated your husband and children from
7    their home in Rochester Hills, what -- to a house in
8    Bentonville, Michigan -- or Arkansas, excuse me, what did
9    you mean by that?
10   A.    Well, given the date, it was December 15th, so it
11   was a week and a half after I had been fired from

12   Wal-Mart.  Clearly at that point in time, my -- my
13   residence was temporary, because I very much understood
14   that the opportunity for me to find comparable employment
15   in Bentonville, Arkansas, was almost nothing.  So at that
16   point in time, my mind-set was I was temporarily living
17   there.
18   Q.    Prior to December 6 of 2006, did you consider the
19   move to Bentonville, Arkansas, to be temporary?
20   A.    No.  I considered the move to Arkansas to be
21   indefinite upon my employment with Wal-Mart, for however
22   long that lasted.
23   Q.    Since early on in 2006, when you moved to the
24   state of Arkansas, have you had an idea or a belief of
25   where you would return from wherever you went to home?
00060
 1   A.    Sure.  I -- home --
 2                  MR. NELSON:  I'm going to object to the
 3   question.  The form of the question is vague.  Go ahead.
 4   A.    Okay.  My understanding of your question is when I
 5   travel, any time I travel since February 6 of 2006, when I
 6   make a return flight, I return home, which is in
 7   Bentonville, Arkansas.
 8                  MR. MORGAN:  I have no further questions.
 9                     REEXAMINATION
10   BY MR. NELSON:
11   Q.    You know, I have, I think, maybe just one follow-up
12   question to something Mr. Morgan asked you about.
13         You were talking about your understanding of the
14   term or duration of your employment at Wal-Mart and --
15   A.    Correct.
16   Q.    You recall that.
17   A.    Yes.
18   Q.    And just -- I'm just paraphrasing it.  If you
19   disagree with this, obviously, correct me.  But basically,
20   I think you were pointing out that Wal-Mart had the right
21   to end that employment at any point at its choosing; is
22   that correct?
23   A.    That's correct.
24   Q.    You also understood that by the same token, you had
25   the right to end that employment at any point of your
00061
 1   choosing.
 2   A.    Yes.  My understanding is that Arkansas is an
 3   at-will state.
 4                  MR. NELSON:  Okay.  That's all I have.
 5   Thank you, guys.
 6                  MR. MORGAN:  Thanks.
 7     (Wherein, at 2:04 p.m., the deposition was concluded.)
 8
 9
10
11
12
13
14
15
16

```
17
18
19
20
21
22
23
24
25
```
00062

```
 1
 2  STATE OF ARKANSAS )
                     )
 3  COUNTY OF BENTON  )
 4          I, SHEILA B. ALEXANDER, Certified Court
    Reporter, a notary public in and for the aforesaid county
 5  and state, do hereby certify that the witness, JULIE ANN
    ROEHM, was duly sworn by me prior to the taking of
 6  testimony as to the truth of the matters attested to and
    contained therein; that the testimony of said witness was
 7  taken by me in Stenotype and was thereafter reduced to
    typewritten form by me or under my direction and
 8  supervision; that the foregoing transcript is a true and
    accurate record of the testimony given to the best of my
 9  understanding and ability.
10          I FURTHER CERTIFY that I am neither counsel for,
    related to, nor employed by any of the parties to the
11  action in which this proceeding was taken; and, further,
    that I am not a relative or employee of any attorney or
12  counsel employed by the parties hereto, nor financially
    interested, or otherwise, in the outcome of this action;
13  and that I have no contract with the parties, attorneys,
    or persons with an interest in the action that affects or
14  has a substantial tendency to affect impartiality, that
    requires me to relinquish control of an original
15  deposition transcript or copies of the transcript before
    it is certified and delivered to the custodial attorney,
16  or that requires me to provide any service not made
    available to all parties to the action.
17
            IN WITNESS WHEREOF, I have hereunto set my hand
18  and affixed my seal of office this 14th day of May, 2007.
19
20
                        SHEILA B. ALEXANDER, CCR, RMR, CRR
21                      LS #586
                        NOTARY PUBLIC
22                      In and for the County of Benton
                        State of Arkansas
23
24  My Commission Expires
    December 9, 2008
25
```